**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 13, 2012

No. 09-30490

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

MEHMOOD M. PATEL,

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:06-CR-60006

Before GARZA, CLEMENT, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:[*]

A jury convicted Mehmood Patel of 51 out of 91 counts of health care fraud in violation of 18 U.S.C. § 1347. His appeal touches nearly every stage of the proceedings in the district court. Among his arguments are that Section 1347 is unconstitutionally vague as applied to his prosecution, his Fourth Amendment rights were violated, the evidence was insufficient, the jury instructions were infirm, and the district court coerced the jury by administering this Circuit's

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-30490

pattern *Allen* charge. He also challenges the substantive reasonableness of his sentence and the court's interpretation of the Sentencing Guidelines.

We AFFIRM.

FACTUAL AND PROCEDURAL HISTORY

Dr. Patel was a cardiologist in Lafayette, Louisiana who owned Acadiana Cardiology Center, L.L.C. He formerly was Chief Cardiologist at LSU Medical Center and had privileges at two Lafayette hospitals. He immigrated to the United States from India in 1972, and he became a citizen in 1980.

A grand jury indicted Dr. Patel on 91 counts of health care fraud in violation of 18 U.S.C. § 1347. The indictment alleged that between February 2001 and January 2004, Dr. Patel defrauded Medicare, Medicaid, and private insurers by seeking reimbursement for "medically unnecessary" procedures. The 91 counts concerned procedures conducted on 74 separate patients. Dr. Patel was reimbursed $89,000 for those procedures. The district court denied Dr. Patel's motion to dismiss the indictment as being unconstitutionally vague.

In February 2002, a nurse working with Dr. Patel contacted the U.S. Department of Health and Human Services ("HHS") with his concerns. The nurse provided documents from a mobile laboratory that Dr. Patel leased several days each week at his office. The lab was inside a large trailer. It had space for diagnostic and treatment procedures. After meeting with HHS Agent Barbara Alleman, the nurse gathered additional records from the mobile lab. On March 26, 2002, the nurse mailed Alleman a letter with the additional information, including two complete lists of Dr. Patel's patients who had undergone angiograms.

Late in 2003, Alleman obtained a search warrant for documents and electronic storage media in the mobile lab and in Dr. Patel's permanent office. The district court denied Dr. Patel's pre-trial motion to suppress this evidence.

2

No. 09-30490

Trial began on September 17, 2008. It spanned three and a half months. The government had at least one expert testify about each of the 91 procedures. The case first went to the jury on December 17. On December 22, the court dismissed the jury foreperson and seated an alternate. The jury was instructed to "begin its deliberations anew." Then, in the early afternoon of the fifth day of the new deliberations, the court received a jury note indicating a possible deadlock. The court directed the jurors to review their prior instructions concerning deliberations. Jurors sent a similar note two hours later. The court responded with the Fifth Circuit's pattern *Allen* charge. On the sixth day, after seven more hours of deliberation, the jury returned a verdict. It convicted Dr. Patel on 51 counts of health care fraud and acquitted him on the other 40 counts.

The Pre-sentence Investigation Report ("PSR") calculated Dr. Patel's Sentencing Guidelines range as between 78 and 97 months. The government successfully sought a two-point enhancement for obstruction of justice, U.S.S.G. § 3C1.1, and a two-point enhancement for "vulnerable victims," U.S.S.G. § 3A1.1(b). Over Dr. Patel's objection, the district court sentenced him to the statutory maximum 120 months in prison on each count, to run concurrently, followed by three years supervised release.[1] He was ordered to pay the maximum Guidelines fine of $175,000 in addition to the costs of incarceration and supervision, as well as $387,511.56 in restitution and a $48,631.39 forfeiture. The court estimated his net worth as $6.4 million.

## DISCUSSION

On appeal, Dr. Patel challenges virtually every aspect of the prosecution from indictment to sentence. We organize our review into eight broad issues that cover all of his arguments.

---

[1] Were it not for the statutory maximum, his Guidelines range would have been 121 to 151 months.

No. 09-30490

## I.    *Vagueness of Health-Care Fraud Statute As Applied*

Dr. Patel was indicted under this statute:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice –

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody of, any health care benefit program,

in connection with the delivery of or payment for health care benefits . . . shall be fined under this title or imprisoned not more than 10 years, or both. . . .

18 U.S.C. § 1347 (2006).[2]

Each of the 91 counts in the indictment stated Dr. Patel had performed the medical service for which he billed.  The government's claim was that each of the procedures described in the indictment was medically unnecessary.  The indictment makes clear the nature of Dr. Patel's charged offenses:

[He] performed medically unnecessary angioplasty procedures and placed stents in arteries that had insignificant disease, knowing full well that such procedures were not done pursuant to generally accepted standards of medical practice and were not performed in compliance with the requirements of Federal Regulations and the healthcare benefit programs. . . . It was further part of the scheme and artifice that [he] falsely claimed that certain medical services and related medical supplies were provided to recipients in accordance with healthcare benefit program agreements, when in truth and fact, as he well knew, he was falsely billing . . . for medical services that were not provided pursuant to generally accepted standards of medical practice and were not in accordance with the requirements of healthcare benefit programs.

---

[2] The Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, §10606(b)(2), 124 Stat. 119, modified the health care fraud statute.  The statutory language "knowingly and willfully" remained, and the Act added a provision that "a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 18 U.S.C. § 1347(b).  Patel's challenged medical services predate this legislation.

No. 09-30490

To avoid unconstitutional vagueness, a criminal statute must give "a person of ordinary intelligence fair notice of what is prohibited." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2718 (2010) (quotation marks and citation omitted). When a challenge arises strictly under the Due Process Clause, however, statutory vagueness is considered in terms of "the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Id.* at 2719 (citation omitted).

Dr. Patel attempts to show vagueness by contrasting the charges against him with other more customary types of health-care fraud prosecutions. Altering billing forms or billing for fictitious patients are obvious examples of artifices used to commit fraud that are free from vagueness. He did not misrepresent costs. His patients and procedures were real. From this, Dr. Patel argues that Section 1347 is vague as applied to cardiac treatments for which medical necessity hinges on the judgment of physicians. He claims that judgments may be quite subjective and be based on observations that misdiagnose arterial blockage by a wide margin of error. These are not insubstantial concerns, as "all persons are entitled to be informed as to what the State commands or forbids." *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (quotation marks and citation omitted).

We need not decide on this appeal whether the standard of "medical necessity" furnishes adequate notice for criminal liability beyond the facts of this case. Dr. Patel admitted in his testimony that medical necessity was personally intelligible as applied to the procedures underlying his convictions.

> Q. [Government Attorney] Dr. Patel, would you agree with me then that lesions that are 30 percent and less, that those lesions should be treated medically and they shouldn't be stented? You agree with that statement, don't you?

No. 09-30490

A. [Dr. Patel] Yes.  If you believe that lesions are less than 30 percent and not flow-limiting, they should be treated medically, yes.

Thus, the concept of medical necessity meant something concrete for Dr. Patel, and he did not have to "guess at its contours."  *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048 (1991).  To the extent, then, that Patel intentionally placed stents in arteries that were flowing properly and not more than 30 percent blocked he had "ample notice that the conduct he engaged in was prohibited." *United States v. Cavalier*, 17 F.3d 90, 93 n.5 (5th Cir. 1994); *see United States v. Daniels*, 247 F.3d 598, 600 (5th Cir. 2001).

## II.    *Sufficiency of the Evidence*

Dr. Patel claims there was insufficient evidence to support the guilty verdict.  We analyze whether a rational jury could have found the evidence to support "the elements of the offense beyond a reasonable doubt."  *United States v. Sandlin*, 589 F.3d 749, 753 (5th Cir. 2009).  Jurors may weigh facts in light of their common sense.  *See id.* at 755.

To prove health care fraud under Section 1347, the government must establish a scheme or artifice (1) to defraud a health care benefit program,[3] or (2) "to obtain by means of false or fraudulent pretenses, representations or promises" money from such a program, conducted (3) "knowingly and willfully," that is, with a specific intent to defraud.  18 U.S.C. § 1347; *United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011).  Intent to defraud is typically proven with circumstantial evidence and inferences. *United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996).  In order to qualify for reimbursement, Dr. Patel had to certify that his procedures were "medically indicated and necessary for the

---

[3] A health benefit program is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual." 18 U.S.C. § 24(b).

6

No. 09-30490

patient." Therefore, seeking payment for unnecessary cardiac interventions is a violation as a scheme to defraud involving false representations.

Our analysis of Dr. Patel's sufficiency claim proceeds in two parts. First, we identify a part of his challenge that is foreclosed. Second, we discuss how the jury could have reasonably concluded that the procedures involved in the 51 counts of conviction were not medically necessary and that Dr. Patel had the requisite intent to defraud in seeking to have them reimbursed.

A.    Inconsistent Verdicts

Thirty-one patients or family members testified for the government as to approximately 41 counts. The government had at least one expert witness testify about each of the 91 procedures.[4] The 40 acquittals were spread across all the experts. Dr. Patel as a witness for himself was certified as an expert on the medical issues in the case. His testimony spanned 19 days of trial. He had six patients testify on his behalf, but he did not call any other experts.

Dr. Patel urges us to compare the facts of the counts of acquittal against those of conviction and speculate how the jurors deliberated to their split verdict. His theory is that there is no discernable pattern and that his convictions therefore cannot stand. "This argument is without merit as it is well established that juries are entitled to render inconsistent verdicts." *United States v. Parks*, 68 F.3d 860, 865 (5th Cir. 1995). Specifically, "a not guilty verdict on one count does not establish any facts favorable to the defense for the purpose of determining the sufficiency of the evidence on the counts of conviction." *United States v. Nguyen*, 28 F.3d 477, 480 (5th Cir. 1994).

---

[4] A local cardiologist, Dr. Lappin, testified on counts 1-19; an interventionalist from the University of Pennsylvania, Dr. Hirsheld, testified on counts 20-38; Dr. Dollar from Emory University gave his opinion as to counts 39-72; and Dr. Moreno from Mt. Sinai in New York testified concerning counts 73-91.

No. 09-30490

Although this inquiry is foreclosed, Dr. Patel is "protect[ed] against jury irrationality or error by the independent review of the sufficiency of the evidence" to which we turn. *United States v. Powell*, 469 U.S. 57, 67 (1984).

B.     Intentionally Performing Unnecessary Procedures

Taking "the evidence and the inferences therefrom in the light most favorable to the verdict," rational jurors could have found Dr. Patel guilty beyond a reasonable doubt. *United States v. Mann*, 493 F.3d 484, 492 (5th Cir. 2007).

As Dr. Patel concedes in his brief, if jurors accepted the opinions of the government experts, "then Dr. Patel deliberately overstated the amount of blockage." Those experts did not simply testify that *they* would not have undertaken the procedures. They testified that *no* legitimate cardiologist could have made the findings that Dr. Patel did, or would have undertaken his procedures. We will "not lightly overturn a determination by the trier of fact that the accused possessed the requisite intent." *United States v. Robichaux*, 995 F.2d 565, 570 (5th Cir. 1993) (quotation marks and citation omitted).

Patel correctly notes that at trial it was uncontested that the margin of error with Dr. Patel's technique of visually estimating blockage is approximately 10% in either direction: *e.g.*, a true 50% blockage could reasonably be perceived in the 40% to 60% range. Given the totality of the evidence, though, this is not a basis for overturning the convictions.

In count after count, the divergence between Dr. Patel's estimate in his documentation (usually re-affirmed by him on the stand) and the government's evidence was vast. Count 11 vividly illustrates this. Dr. Lappin, the government's expert, found zero blockage, whereas Dr. Patel claimed between 60% and 70% blockage. Dr. Patel performed a stent procedure, which resulted in the patient developing yellow jaundice. From this type of evidence, jurors were entitled to disbelieve Dr. Patel's claims of good faith, and instead to conclude that his figures had been falsifications.

No. 09-30490

Furthermore, on every count at least one expert averred that in his medical opinion the procedure had been medically unnecessary. Often, examining the same evidence confronting Dr. Patel, they characterized his blockage estimates as "false statements." The jury was permitted to credit this testimony; it came with the caution that expert opinions ought to receive only the weight they deserved, based on "the witness's education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

Beyond the expert testimony, there were other facts probative of both intent and the absence of medical necessity in his procedures. Dr. Patel performed invasive diagnostic angiograms and stented more often than his peer cardiologists. The jury could conclude that Dr. Patel represented necessity where none existed. There was also evidence that could support the inference that he had contributed to the falsification of patients' records. Medical charts for patients in his care reported chest pain symptoms, while those patients testified having never made those complaints. In addition, there was evidence that Patel abruptly changed course, evincing possible consciousness of guilt, after the government executed its search warrant. He ordered fewer procedures, revised existing patient medical findings, and cancelled already scheduled stentings. Finally we note that the trial judge viewed Patel's days on the stand as rife with perjury; in deference to the verdict we can infer that a reasonable jury could have arrived at the same conclusion, drawing from that adverse credibility determination an additional inference of guilt.

"The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Clayton*, 506 F.3d 405, 412 (5th Cir. 2007) (quotation marks and citation omitted). By this standard, there is sufficient evidence to sustain Dr. Patel's convictions.

### III.    Denial of Suppression

Dr. Patel claims a violation of his right under the Fourth Amendment that he not be subjected to "unreasonable searches and seizures." U.S. Const. amend. IV.  The Amendment also guarantees that "no Warrants shall issue, but upon probable cause."  *Id.*  Only evidence "that is derivative of an illegality, or constitutes 'fruit of a poisonous tree'" is subject to suppression under the exclusionary rule.  *United States v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000) (quotation marks and citation omitted).  A key exception is the independent-source doctrine.  That doctrine "permits the introduction of unlawfully discovered evidence when the police have acquired [it] through a distinct, untainted source."  *Id.*

When law enforcement officers executed a search warrant on November 17, 2003, they obtained patient records, billing statements, insurance records, and electronic storage devices.  Dr. Patel contends this evidence should have been suppressed for two distinct reasons.  First, he claims that the warrant was based on the fruits of an earlier warrantless search.  Second, he argues that the warrant lacked probable cause to permit the seizure of the items it described.

### A.    Warrantless Search

Because the Fourth Amendment only constrains the government, it "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official."  *United States v. Oliver*, 630 F.3d 397, 406 (5th Cir. 2011) (quotation marks and citation omitted).

Evidence was initially gathered by a private citizen, Neil Kinn.  Kinn was a Registered Nurse doing contract work at Dr. Patel's clinic who acted as a whistleblower of sorts.  He contacted HHS Agent Alleman concerning what he considered potentially illegal conduct.  Kinn acted on his own initiative when he supplied Alleman with documents during their first meeting on March 15, 2002.

10

No. 09-30490

In contrast, the district court found that Kinn acted as an agent or instrument of the government when he transmitted additional evidence on March 26. We accept that conclusion. That means any evidence collected by Kinn after March 15 must satisfy the requirements applicable to government agents. *See United States v. Blocker*, 104 F.3d 720, 726 (5th Cir. 1997).

The district court held that Dr. Patel could not invoke the protection of the Fourth Amendment because he had no legitimate expectation of privacy in the mobile lab. Dr. Patel insists he had a sufficient interest. He leased the lab from a medical services company; it housed his confidential patient records; three days each week, the lab parked in a parking lot for his staff that was near an office side entry door. The government says there was no reasonable privacy interest because Dr. Patel took no affirmative steps to prevent third-parties from accessing the trailer. Further, on other weekdays the lab was driven to other locations for the use of other doctors.

Since briefing and argument, the Supreme Court has given fresh guidance on how to identify the scope of the Fourth Amendment's reach. *See United States v. Jones,* 132 S. Ct. 945, 949 (2012). It had long been understood that "[a] search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Oliver*, 630 F.3d at 405 (quotation marks and citation omitted). This principle was drawn from a concurrence by Justice Harlan in *Katz v. United States*, 389 U.S. 347 (1967) and was applied here by the district court. *See Jones*, 132 S. Ct. at 950. In *Jones*, though, the Supreme Court explained that *Katz* is not the "the exclusive test." *Id.* at 953. Instead, "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id.* at 952; *see also id.* at 954-55 (Sotomayor, J., concurring). The Fourth Amendment now clearly "protects against trespassory searches" concerning "those items ('persons, houses, papers, and effects') that it enumerates." *Id.* at 953 n.8.

11

We do not need to answer today how *Jones* bears on the district court's holding, however.  Even if Dr. Patel had a sufficient privacy or possessory interest in the mobile lab to implicate the Fourth Amendment and render  Nurse Kinn's post-March 15 evidence gathering a violation, because there was an independent source for it, the evidence was properly admitted.  "[I]nformation which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source."  *United States v. Hearn*, 563 F.3d 95, 102 (5th Cir. 2009) (quotation marks and citation omitted).  Evidence seized with a warrant will qualify as independent if (1) the judicial officer's determination of probable cause did not rest on the earlier illegality, and (2) the illegal search did not "affect or motivate the officers' decision to procure the search warrant."  *Id.*; *United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002).

The warrant's probable cause affidavit contains none of the information acquired by Kinn after March 15.  That satisfies the first concern under *Hearn*. There is also evidence that Kinn's second transmission of documents did not influence Agent Alleman's decision to seek a warrant.  Testimony revealed that Alleman concluded that Kinn's information was insufficient to justify continuing her investigation; she proceeded to close the case and take maternity leave.  The investigation resumed months later only after a new informant complained.

Although Dr. Patel presents significant argument to link Kinn generally to two of the informants who were the basis for the warrant, that is insufficient. This second-prong of the independent source inquiry is a factual determination "reviewed under the clearly erroneous standard."  *United States v. Hassan*, 83 F.3d 693, 697 (5th Cir. 1996).  The evidence does not give us the definite and firm conviction that post-March 15 information affected the warrant.  Because there is no clear error, any taint potentially arising from Nurse Kinn's actions on behalf of the government is sufficiently attenuated so as not to merit suppression. *See Grosenheider*, 200 F.3d at 327.

No. 09-30490

B.    Validity of Search and Seizure Under Warrant

As an alternative argument, Dr. Patel claims that the warrant was defective. Though he speaks in terms of "overbreadth," his actual contention is that there was not probable cause for the warrant based upon the supporting affidavit.[5] The government is likely correct that our review should be for plain error because Dr. Patel raises this contention for the first time on appeal. Regardless, Dr. Patel's argument fails under any standard of review.

When a party challenges a seizure pursuant to a search warrant, we apply a two-part analysis. *United States v. Allen*, 625 F.3d 830, 835 (5th Cir. 2010). "First we ask whether the seizure falls within the good-faith exception to the exclusionary rule." *Id.* That "inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* (quotation marks and citation omitted). If the good-faith exception is met, "this court affirms the district court's decision denying the motion to suppress." *Id.* Only when the exception does not apply, does this court go "to the second step and determine[] whether the magistrate issuing the warrant had a substantial basis for believing there was probable cause for the search." *Id.* (quotation marks and citation omitted). Probable cause simply requires "a fair probability" that evidence of a crime will be found and should be a "practical, common-sense decision." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The evidence for good faith reliance is sufficient here. The affidavit details statements from informants who claimed to witness Dr. Patel's falsifying patient records, as well as information that from 1999-2003 he was the second-highest

---

[5] Overbreadth claims focus on the Fourth Amendment's requirement that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. *See, e.g.*, *United States v. Allen*, 625 F.3d 830, 835-36 (5th Cir. 2010) (analyzing a warrant that failed to describe the items to be seized with particularity).

biller in all of Louisiana. On 88 days, he charged 100 or more service-equivalent hours. This information concerning an extraordinary volume of procedures was suspicious enough to permit "a reasonably well trained officer" to conclude that the magistrate's warrant authorized a lawful search. *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984).

There was no invalidity to the seizure of the mobile lab documents.

## IV. *Dismissal of Foreperson – Juror No. 9*

This court reviews a district court's decision to dismiss a juror for good cause under an abuse of discretion standard. *United States v. Edwards*, 303 F.3d 606, 631 (5th Cir. 2002). "Unless the court's removal of the juror has prejudiced the defendant, we will not disturb the court's decision. Moreover, we will find prejudice only if the juror was discharged without factual support or for a legally irrelevant reason." *United States v. Virgen-Moreno*, 265 F.3d 276, 288 (5th Cir. 2001) (quotation marks and citation omitted). We are not permitted to reverse without "the definite and firm conviction that a mistake has been committed." *Edwards,* 303 F.3d at 631.

Dr. Patel makes three alternative arguments regarding the dismissal. First, he claims that a note from a juror submitted on the morning of Day 3 of deliberations did not justify questioning jurors. Second, he attacks the factual basis underlying dismissal of a juror. Finally, Dr. Patel claims that while the court dismissed Juror 9 for failing "to follow [the] Court's instructions on a juror's duty to deliberate," there was a reasonable possibility that the conduct was actually the result of that juror's viewing the evidence in a manner contrary to her fellow jurors.

The district court properly investigated juror conduct. Notwithstanding its "duty to protect the secrecy of jury deliberations, the district court continues to enjoy wide discretion to determine the proper scope of an investigation into

whether just cause to dismiss" exists. *Id.* at 634. The investigation was the result of one juror's written note to the district judge. The note alleged that Juror 9, the foreperson, had engaged in "verbal abuse" towards as many as six other jurors and that "she has already made up her mind, from the beginning and no more can change it." It further reported that she was preoccupied reading a book and refused to speak. The court gave both parties an opportunity to review and research the law on the issues raised in the note. It then heard argument. After deciding to pose five questions to each juror, the court solicited proposed language from the parties.[6] An investigation was fully warranted and the court's approach was sound. *See United States v. Ebron*, 683 F.3d 105, 128-29 (5th Cir. 2012) (noting that credible allegations of a refusal to deliberate permits an investigation by the district court).

Dr. Patel cannot demonstrate clear error in the court's factual finding either. The court noted it was "loath to excuse a juror in a criminal case," but credited the eight jurors who testified that Juror 9 refused to deliberate and that, when questioned, she had lied. The "district court, based on its unique perspective at the scene, is in a far superior position than we are to appropriately consider allegations of juror misconduct." *Ebron*, 683 F.3d at 126 (quotation marks and citation omitted); *see also United States v. Nnaji*, 70 F. App'x 217, 218 (5th Cir. 2003) (per curiam) (affirming juror's dismissal for "unwillingness to deliberate," in part, because the "dismissed juror read a book during deliberations").

Dr. Patel also contends that the juror was erroneously dismissed based upon her view of the evidence rather than for "good cause." Fed. R. Crim. P. 23(b). This is "at best rank speculation." *Edwards*, 303 F.3d at 634; *see United*

---

[6] Dr. Patel finds fault with Question 4. He did not object in the district court and thus waived any argument as to the form of the question.

*States v. Leahy*, 82 F.3d 624, 629 (5th Cir. 1996). Relying on other circuits' caselaw, Dr. Patel claims that we must set aside a juror's dismissal unless there is "no possibility" that it related to an evidentiary disagreement. *See, e.g.*, *United States v. Thomas*, 116 F.3d 606, 621-22 (2d Cir. 1997); *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987).

Our circuit recently reviewed these authorities and the "no possibility" standard they represent. *See Ebron*, 683 F.3d at 126. Without adopting it, we explained that this "'no possibility' rule is triggered only when the district court dismisses a juror based on its 'conclusion that the juror is failing to participate in the deliberative process in accordance with the law.'" *Id.* at 127 (quoting *Edwards*, 303 F.3d at 633).[7] Accordingly in *Ebron*, we held "Rule 23's good cause standard" still applies when the district court offers reasons other than those implicating deliberation. *Id.* at 128. This is the situation here. The district court made a "finding of fact" that "Juror Number 9 was not candid with the Court in her responses to the Court's direct questions." As recently re-affirmed, lack of candor is acceptable cause for dismissal. *Id.* at 127-28.

Dr. Patel complained that no investigation was merited, then he argued that the district court, once allowing an investigation, should have allowed free-form explanations and follow-up questioning of jurors. We find the district court's more controlled approach to have been wise, as a delicate balance is needed to investigate misconduct so as "to avoid any disclosure of the content of deliberations." *Id.* at 125.

---

[7] We further note that "*Brown* and *Thomas* [were] 'jury nullification' dismissals'" in which the "juror was refusing to apply the substantive law" relevant to the case. *Edwards*, 303 F.3d at 632. The Second Circuit has expressly limited *Thomas* on that basis. *See United States v. Baker*, 262 F.3d 124, 132 (2d Cir. 2001) (holding that because "the district court's reason for dismissing the juror was that the juror refused to participate in deliberations as required by her obligations as a juror, the rule of *Thomas* does not apply.").

The district court sat an alternate after dismissing the juror.  *See, e.g.*, *United States v. Leahy*, 82 F.3d 624, 629 (5th Cir. 1996).  The district court did not err in its handling of this difficult issue.

*V.*    Allen *Charge to Jury*

The *Allen* charge was given to the jury after days of deliberations and indications of potential deadlock.  *Allen v. United States*, 164 U.S. 492, 501 (1896).  The charge has been said to be a valuable tool and a source of danger.  *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988); *United States v. Fields*, 483 F.3d 313, 339 (5th Cir. 2007).  The instruction can "blast a verdict out of a jury otherwise unable to agree that a person is guilty."  *Fields*, 483 F.3d at 339.  It is justified because the "very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves."  *Allen,* 164 U.S. at 501.

The instruction must be used judiciously.  *Fields*, 483 F.3d at 339.  "To compel a jury to agree upon  a verdict is a denial of a fair and impartial jury trial, and, hence is a denial of due process." *Mills v. Tinsley*, 314 F.2d 311, 313 (10th Cir. 1963); *Hale v. United States*, 435 F.2d 737, 741 (5th Cir. 1970).  In order to judge whether an *Allen* charge properly encouraged jurors to deliberate vigorously or unconstitutionally "coerced the jury" into abandoning their opinions, this Circuit employs a two-part test.  *Hale*, 435 F.2d at 741.  We ask whether (1) the trial court administered the charge using appropriately non-prejudicial language, and (2) then scrutinize whether in the totality of the circumstances the charge coerced the jurors.  *Fields*, 483 F.3d at 339; *United States v. Lindell,* 881 F.2d  1313, 1321 (5th Cir. 1989).

The parties agree that the court administered this court's pattern *Allen* charge verbatim.  *See* Fifth Cir. Pattern Crim. Jury Instructions § 1.45 (2001).

No. 09-30490

Under our precedents, the language is not coercive. *See United States v. Allard*, 464 F.3d 529, 536 (5th Cir. 2006).

Though the language of the charge was valid, a conviction can be overturned based exclusively on whether under the circumstances the jury was coerced. *United States v. Fossler*, 597 F.2d 478, 485 (5th Cir. 1979). Though we find *Fossler* distinguishable, we do not do so casually. We reversed in *Fossler* when the court gave the *Allen* charge once orally and then repeated it in writing later, after the jury reported it was deadlocked. *Id.* at 483. We also were concerned that the jury (i) returned its verdict quickly after the second charge, within one hour, and (ii) had "indicated at three separate points in time, over a three day period, that it could not reach a decision." *Id.* at 485.

By contrast, the jury in this case reported deadlock only twice, retired for the evening after hearing the charge and proceeded to deliberate the next day for seven hours before convicting. Importantly, the jury also returned a discriminating verdict, in the sense that it acquitted Dr. Patel of 40 of the indicted counts. *See United States v. Heath*, 970 F.2d 1397, 1406 (5th Cir. 1992).

Dr. Patel submits that the judge administered two *Allen* charges as occurred in *Fossler*. We disagree. After its second deadlock, the court orally read the pattern *Allen* charge and simultaneously gave the jurors a written copy, which they took back into the deliberation room. Though furnishing jurors with a written copy of instructions is not advisable, *United States v. Sotelo*, 97 F.3d 782, 792-93 (5th Cir. 1996), that situation is markedly different from two separate invocations of *Allen*.

Dr. Patel argues that the jury note precipitating the *Allen* charge was unusually emphatic. It read:

> The jury stands firm in their beliefs. We cannot come to a unanimous decision, and we do not believe in changing our votes and beliefs just to come to a unanimous decision.

18

No. 09-30490

Although the tenor of the note initially gave the district court pause, the court opted for the charge, explaining its decision represented its best judgment.

Dr. Patel makes a variety of other arguments including the factually inaccurate assertion that the jurors stood to lose the New Year's holiday unless they agreed on a verdict. We perceive no coercion from his other cited circumstances, several of which he failed to object to below.

"The district court has broad discretion to give an *Allen* charge when the jury indicates that it is deadlocked." *United States v. Redd*, 355 F.3d 866, 877 (5th Cir. 2003) (quotation marks and citation omitted). The district court was appropriately hesitant to administer the charge and did so only after reflection and care. *Cf. Hale*, 435 F.2d at 741. We find no abuse of this broad discretion in the district court's giving of the charge.

Dr. Patel argues that this Circuit should reconsider the language of our pattern *Allen* charge. The power of the charge is proven by this case. Such an effective weapon against jury deadlock must not threaten to overwhelm the legitimate disagreements among jurors. We see nothing in this record beyond the language of the charge itself to suggest any error. We do not accept the invitation to re-evaluate the pattern charge on this appeal.

*VI.    Other Jury Instructions*

A district court has substantial discretion in the instructions it gives. We will not reverse based on faulty instruction if the charge is correct as a whole. *United States v. Ortiz-Mendez*, 634 F.3d 837, 839 (5th Cir. 2011).

A.    Court's Response to Juror Note 3

The third note sent to the district judge by jurors asked for a definition of "Intent." The court responded that "you may find intent to defraud if you find that the defendant acted knowingly, as defined in the [original] jury instructions . . . , with the specific intent to deceive." Dr. Patel contends this was misleading

19

because the court here omitted reference to "willfully" which is part of the *mens rea* required under Section 1347.

The jury had already correctly been instructed that "willfully" meant "voluntarily and purposefully with the specific intent to do something the law forbids." Not only was the term supplied twice elsewhere in the court's response to Note 3 (which raised several questions), but the concepts of specific intent and willfully overlap. There was no error.

### B.     Request for a Special Bias Instruction

Dr. Patel sought a special charge that patients testifying against him "are also plaintiffs in civil suits" and "are seeking money damages." "The court may decline a requested charge if it has been stated elsewhere in the instructions." *United States v. Garza*, 754 F.2d 1202, 1210 (5th Cir. 1985). Jurors in other guidance were told they should consider whether witnesses had "any particular reason not to tell the truth" and whether they had "a personal interest in the outcome of the case."[8] No extra language was needed.

### VII.   *Objections to Evidence*

We have just discussed certain jury instructions. We now return to events earlier in the trial. Dr. Patel claims error in the admission of certain evidence. Evidentiary errors "must be disregarded" unless they affect substantial rights, which requires there be "a reasonable probability that the improperly admitted evidence contributed to the conviction." *United States v. Sumlin*, 489 F.3d 683, 688 (5th Cir. 2007). The admission of evidence is reviewed under an abuse of discretion standard, subject also to harmless error analysis. *United States v. Sanchez-Hernandez*, 507 F.3d 826, 831 (5th Cir. 2007).

---

[8] Below, we explain that Dr. Patel's theory of bias was based on a misleading half-truth that the district court appropriately allowed the government to remedy on rebuttal.

No. 09-30490

Dr. Patel claims that the district court improperly admitted: (1) evidence of Dr. Patel's behavior toward patients whose procedures were not among those in the indictment, (2) information on the volume of Dr. Patel's procedures, (3) lay opinion testimony purportedly based on scientific, technical or specialized knowledge, (4) an expert witness to testify on a physician's duty of care, and (5) rebuttal evidence from the government about civil lawsuits filed against Dr. Patel by his patients. We find no error in any of these, as we will explain.

*(1) Conduct Toward Other Patients*

First in a motion *in limine*, and then with a standing objection at trial, Dr. Patel preserved this point. *See id.*; *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 733 (5th Cir. 2011). His argument is that roughly four days of trial testimony about his misconduct toward other patients constituted inadmissible character evidence under Rule 404(b). The evidence generally consisted of staff testimony that Dr. Patel called patients derogatory names, silenced complaints as to safety, and engaged in unsafe medical practices, such as leaving patients unsupervised or starting procedures before a nurse arrived.[9]

The court originally excluded much of this by granting Dr. Patel's *in limine* motion. As the evidence developed, it reversed course with a series of oral rulings during trial. From the transcript it is not always certain whether the court admitted them under Rule 404(b) or as intrinsic evidence.

Due to the ambiguity, and because this disparate evidence over a substantial time-horizon may not qualify as intrinsic,[10] we examine whether this

---

[9] The government provided pre-trial notice as to that evidence concerning as many as two hundred patients. Although it disclaimed reliance on Rule 404(b) – instead arguing its intrinsic status as part of "the scheme and artifice" charged – Dr. Patel does not seek reversal on the basis of notice. *See* Fed. R. Evid. 404(b)(2) (prosecutor must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial").

[10] *See United States v. Carrillo*, 660 F.3d 914, 927 (5th Cir. 2011) ("Intrinsic evidence is admissible to complete the story of the crime by proving the immediate context of events in time and place. . . .") (quotation marks and citation omitted); *e.g., United States v. Aleman*, 592

evidence was properly admitted under Rule 404(b).  Such evidence must be (1) "relevant to an issue other than the defendant's character," *Sumlin*, 489 F.3d at 690, and (2) under Rule 403 its probative value cannot be "substantially outweighed by its prejudicial impact."  *Id.* at 691 (quoting *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc)).  Our abuse of discretion standard is "heightened" when reviewing evidence admitted under Rule 404(b). *Carrillo*, 660 F.3d at 926.

There was no error here.  This evidence was relevant to an issue other than conformity with bad character.  Appropriate purposes include as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident."  Fed. R. Evid. 404(b).

In order to prove health care fraud, the government had to prove Dr. Patel had the specific intent to bill for medically unnecessary procedures.  A key aspect of Dr. Patel's defense, as he asserted during his many days on the stand, was that he demonstrated abundant compassion for his patients.  "Under Rule 404(b), the Government properly introduced the evidence to rebut [his] defense of lack of intent."  *United States v. Jensen*, 41 F.3d 946, 958 (5th Cir. 1994).

Next, Dr. Patel contends the evidence about his behavior towards patients was unfairly prejudicial.  The Federal Rules strongly favor admitting probative evidence; only clear abuses of discretion will be declared unfairly prejudicial. *United States v. Curtis*, 635 F.3d 704, 716-17 (5th Cir. 2011).  As the analysis at step one illustrates, evidence of Dr. Patel's interactions with patients gave jurors a context in which to gauge whether the charged procedures they deemed medically unnecessary were motivated by compassion or by a criminal purpose. Further, the court advised the jury that Dr. Patel "was not on trial for any act,

---

F.2d 881, 885 (5th Cir. 1979) (intrinsic, when "person breaks into a house, murders the occupants, and steals a television set").

conduct, or offense not alleged in the indictment" and there was nothing about the evidence that particularly invited "the jury to ignore the evidence and convict [Dr. Patel] on an emotional basis." *Id.* at 717.

*(2) Volume of Procedures*

Dr. Patel contends that two reports that revealed he vastly outpaced other cardiologist both in the number of procedures and patients were irrelevant. Rather than support the government's suggested inference that he was an "assembly-line doctor," Dr. Patel argues that the numbers were reflective of his efficiency, hard work, and popularity with patients.   Dr. Patel's and the government's arguments are both colorable.  That illustrates why the evidence was admissible, with its weight and effect left to jurors.  Relevance is not a "steep or difficult" standard. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 256 n.20 (5th Cir. 2009).

Dr. Patel's state of mind and medical necessity were relevant.  The volume of procedures was circumstantially probative on both factual issues.

*(3) Lay Witness Testimony*

Lay witnesses may not offer testimony "based on scientific, technical or other specialized knowledge."  Fed. R. Evid. 701.   The essential difference between "lay and expert testimony is that lay testimony results from a process of reasoning familiar in everyday life, whereas expert testimony results from a process of reasoning that can only be mastered by specialists." *United States v. York*, 600 F.3d 347, 360 (5th Cir. 2010).  Dr. Patel is correct that at times nurses and technicians who were not qualified as experts opined about arterial blockage or whether an X-ray indicated a lesion.  Although the general thrust of their testimony concerned factual matters such as Dr. Patel's reputation with staff, these witnesses arguably strayed impermissibly into expert terrain. *See, e.g., id.* at 361 (testimony on the causes of brain damage or the time for bruises to develop beyond ken of lay witnesses).

Nonetheless, the error was isolated and not reversible. To warrant reversal, we must discern a "reasonable probability" that the inadmissible evidence affected the conviction. *Sumlin*, 489 F.3d at 688. As recounted at length already, medical experts testified on each procedure in the indictment. When, as here, "objected to testimony is cumulative of other testimony that has not been objected to, the error that occurred is harmless." *United States v. Griffin*, 324 F.3d 330, 348 (5th Cir. 2003).

*(4) Expert Witness Certification*

On the morning a government's expert was to testify about a physician's duty of care, Dr. Patel objected to allowing such testimony. The district court responded that it was unfair for that objection to be made at that late date.

The expert, Dr. James Kirkpatrick, was a cardiologist-medical ethicist who properly testified in order to assist the jurors in understanding the standards to which the medical profession generally holds itself. "Knowing how doctors generally ought to act is essential for a jury to determine whether a practitioner has acted not as a doctor, or even as a *bad* doctor, but . . . without a legitimate medical justification." *United States v. Feingold*, 454 F.3d 1001, 1007 (9th Cir. 2006). Any "evidence that a physician deviated drastically from accepted medical standards is probative of criminal liability." *United States v. McIver*, 470 F.3d 550, 559 (4th Cir. 2006) (quotation marks and citation omitted). In addition, Dr. Patel invited this testimony with his defense strategy that "it was his duty as a doctor" and gratitude to Americans as a naturalized citizen that drove him. *See United States v. Maldonado*, 472 F.3d 388, 398 (5th Cir. 2006), *abrogated on other grounds by Kentucky v. King*, 131 S. Ct. 1849 (2011).

Dr. Patel's suggestion that the jurors more appropriately could have drawn on what they had seen on television medical dramas as a benchmark is a surprising comparison and a false one. There was no reversible error in admitting Dr. Kirkpatrick's testimony.

*(5) Rebuttal Evidence*

Some of Dr. Patel's former patients testified against him.  To undermine their credibility, he raised the fact that they had filed civil lawsuits against him, the inference being that convicting Dr. Patel would be financially advantageous.  This was entirely proper. The ability to expose "possible motivations for false testimony is a fundamental element" of a defendant's Confrontation Clause right.  *United States v. Hall*, 653 F.2d 1002, 1008 (5th Cir. Unit A Aug. 1981).

The civil suits had been settled by the time the witnesses testified.  Dr. Patel argues that the government, in its rebuttal case, was precluded from apprising the jury of that fact.  The law works no such unfairness.  To avoid having the jury receive "only half the picture," the law permits the district court to strike a reasonable balance concerning bias impeachment.  *United States v. Rutgard*, 116 F.3d 1270, 1279 (9th Cir. 1997).  Rule 408 prohibits informing jurors of prior efforts at compromise of litigation, but that exclusion "permits evidence of settlement agreements for purposes other than proving liability." *United States v. Hays*, 872 F.2d 582, 588-89 (5th Cir. 1989); *see also* Fed. R. Evid. 408(b).  This rebuttal evidence was properly admitted.

*VIII.  Challenges to Sentencing*

A.     Application of the Sentencing Guidelines

"This court reviews *de novo* the district court's guidelines interpretations and reviews for clear error the district court's findings of fact." *United States v. Le*, 512 F.3d 128, 134 (5th Cir. 2007).

1.     *Vulnerable Victim Enhancement*

Dr. Patel first challenges the two-level enhancement that applies to offenders who "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1).  A vulnerable victim is one who "due to age, physical or mental condition . . . [is] particularly susceptible to the

criminal conduct." *Id.* cmt. n.2.  The PSR did not recommend this enhancement and the government objected.  The trial court, he argues, should have identified the characteristics that made his victims more susceptible than generic heart patients.  In fact, the district court recounted many examples of patients with uniquely vulnerable circumstances.  One example was an 81 year-old patient who went to Dr. Patel for clearance for a back operation.  There was evidence Dr. Patel induced her to have an unnecessary stent implanted, which delayed her operation.  *Cf.  United States v. Sidhu*, 130 F.3d 644, 655 (5th Cir. 1997) (affirming this enhancement for doctor who involved patients "debilitated by pain or depression" in his fraudulent billing scheme).

At sentencing, Dr. Patel argued that he did not lure the vulnerable to his practice.  Rather, those who came to him just happened to be susceptible.  The enhancement, though, does not require "a specific 'targeting' of a vulnerable victim beyond the requirement that the defendant knew or should have known of the vulnerability."  *United States v. Burgos*, 137 F.3d 841, 843-44 (5th Cir. 1998).

### 2.    *Obstruction of Justice Enhancement*

Dr. Patel's next challenge is to the enhancement for a defendant who "willfully obstructed or impeded . . . the administration of justice."  U.S.S.G. § 3C1.1.    As with the vulnerable victim's enhancement, the PSR did not recommend this.  Perjury satisfies Section 3C1.1.  *See* U.S.S.G. § 3C1.1 cmt. n.4(B); *United States v. Williams*, 517 F.3d 801, 808 (5th Cir. 2008).

The district court found that "by clear and convincing evidence, the defendant did, in fact, on numerous occasions willfully obstruct justice by perjuring himself on material matters during his testimony."   This is a higher standard of proof than is required.  *See United States v. Nava*, 624 F.3d 226, 229 (5th Cir. 2010).  The district court gave examples such as Dr. Patel's claim that he never falsified patient records, while several patients testified they never

complained about the symptoms listed on their charts, and his flat denial of verbally abusing patients but several witnesses had recollections to the contrary.

The district court stated that it was aware that inaccurate testimony "may result from confusion, mistake or faulty memory." Mindful of that caveat, the district court still found Dr. Patel perjured himself. There was no clear error.

B.    Substantive Challenge to the Sentence

Dr. Patel received a sentence of 120 months in prison in addition to a total monetary penalty of $445,175. He lodges three objections under the rubric of substantive unreasonableness. An abuse of discretion standard applies to this challenge. *United States v. Diaz*, 637 F.3d 592, 603 (5th Cir. 2011). To the extent Dr. Patel received a within-Guidelines sentence we grant it a "presumption of reasonableness." *Id.*

Determining the amount of loss is a finding of fact reviewed for clear error, while "the court's choice of the method by which losses are determined involves an application of the sentencing guidelines, which is reviewed *de novo.*" *United States v. Lucas*, 516 F.3d 316, 350 (5th Cir. 2008) (quotation marks and citation omitted).

1.    *Sentence Generally*

According to Dr. Patel, the district court treated the Guidelines as mandatory and abused its discretion in weighing the Section 3553 factors for considering a variance. *See* 18 U.S.C. § 3553. We disagree. The district court properly explained why it rejected all the nonfrivolous arguments raised by the defense. "Sometimes the circumstances will call for a brief explanation; sometimes they will call for a lengthier explanation." *Rita v. United States*, 551 U.S. 338, 357 (2007).

2.    *Loss Calculation*

Dr. Patel claims that the loss amount of $762,121 overstates his culpability. He received only $48,000 from the counts of conviction. He claims that nearly

half of the claimed loss ($374,610) arose under counts for which he was acquitted.[11] At sentencing, though, he stipulated to allowing "the loss from the acquitted conduct" to be included and agreed the total represented a "correct application of the guidelines." *See* U.S.S.G. § 2B1.1. The district court considered Dr. Patel's arguments for a variance or departure, but found them unconvincing. *See United States v. Campos-Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008).

### 3. Fine Imposed

Dr. Patel objects to the fact that a cost-of-incarceration and supervision fee ("COIF") was added to his $175,000 fine. He also claims procedural error and a lack of notice as to the COIF's imposition.

On the issue of notice, under the post-*Booker* advisory sentencing regime, a defendant may not "place the same degree of reliance on the type of 'expectancy' that gave rise to a special need for notice" as to sentencing deviations. *Irizarry v. United States*, 553 U.S. 708, 713-14 (2008) (interpreting Fed. R. Crim. P. 32(h)). In any event, the notice requirement was narrow and only applied to deviations "based on a ground not identified as a ground for departure either in the presentence report or in a pre-hearing submission." *Id.* at 715 (quotation marks and citation omitted). Here, the PSR sufficiently informed Dr. Patel about the possible COIF. As the district court noted in rejecting this argument, that report warned him that "the Court shall impose an additional fine amount that is at least sufficient to pay the costs" of imprisonment, subject to his "ability to pay."

Dr. Patel's argument that the court erred in imposing the COIF must also fail. He did not object at the sentencing hearing, instead waiting to raise it until the government sought to use Dr. Patel's cash bond to pay the COIF. Plain-error

---

[11] This loss figure represents the reimbursement for angioplasties and includes money paid to hospitals, rather than to Patel directly.

review applies to an unobjected-to fine. *United States v. McElwee*, 646 F.3d 328, 338 (5th Cir. 2011).  His contention is meritless regardless of the standard of review.  For his total offense level of 32 and Criminal History Category I, the maximum Guidelines fine was $175,000.  However, the district court, in an order permitting use of the bond, explained that it had considered the additional $270,175 in COIF to have been imposed as a variance from the Guidelines fine under the Section 3553(a) factors.  The Guidelines specify that the COIF is considered in calculating an appropriate fine.  *See* U.S.S.G. § 5E1.2(d).  As the district court explained, "merely because [it] addressed the punitive fine separately from the costs during the sentencing hearing does not change the nature of the imposition . . . . [T]he total fine, including the imposed costs was within the statutory maximum."  *Cf. United States v. Vazzano*, 588 F. Supp. 2d 288, 291 (D. Conn. 2008) (noting the Second Circuit has often referred to the obligation to pay the cost of supervision as a "fine") (citing *United States v. Mordini*, 366 F.3d 93, 95 (2d Cir. 2004)).

As for Dr. Patel's argument that the district court erred by not adequately explaining that decision, we deem it waived because he failed to raise it at any stage in the district court; thus our review is for plain error.  He cannot prove "that an explanation [about the fine] would have changed his sentence."  *United States v. Mondragon-Santiago*, 564 F.3d 357, 365 (5th Cir. 2009).  Though he did not link it to the COIF, the district judge explained that his overall sentence reflected "an individualized assessment based on the facts" and had been calculated to "afford adequate deterrence to criminal conduct by other doctors and healthcare providers who may be similarly inclined to cheat Medicare."

The judgment of conviction and the sentence are AFFIRMED.