**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joe E. FRYAR, Defendant–Appellant.**

No. 88–4200.

United States Court of Appeals,
Fifth Circuit.

March 1, 1989.
Rehearing Denied April 18, 1989.

Clinard J. Hanby, Houston, Tex., J. Minos Simon, Lafayette, La., for defendant-appellant.

John P. Lydick, Asst. U.S. Atty., Joseph S. Cage, Jr., U.S. Atty., John A. Broadwell, Asst. U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before BROWN, JOHNSON and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellant, Joe E. Fryar, challenges his conviction following a jury's guilty verdict on eight counts of jury tampering and conspiracy to corruptly influence a jury. We find no error and affirm.

I.

A jury convicted Fryar on eight counts of obstruction of justice, conspiracy, and aiding and abetting under 18 U.S.C. §§ 2, 371, and 1503. The charges stemmed from efforts to bribe three jurors during the trial of a civil case in the United States District Court for the Western District of Louisiana, in which Fryar was a defendant. The government presented evidence that Fryar conveyed bribe offers to two jurors using intermediaries. Two of those intermediaries testified for the prosecution.

On the government's motion, the district court sequestered the jury that was hearing Fryar's jury tampering case in a section of the Holiday Inn in Monroe, Louisiana. Two marshals were stationed in an end room at the head of the staircase; another was positioned in a room at the other end of the jurors' rooms. The drapes in both rooms were open. The marshals also placed yellow cones bearing "No Trespassing" signs at each end of the balcony.

As the jurors chatted in the courthouse jury room on Saturday, January 30, 1988, juror Steven Faulkner stated that a woman had come to his room about 1:30 a.m. Saturday. Several jurors, including Pam Guillot, advised him to report the visit to the marshals. Faulkner said he had told the marshals about the visit that morning, and then clarified his description of the visit. Faulkner, whose room, 250, was three doors down from the guards' command post room, told the other jurors that a young woman had knocked on his motel door the night before looking for a fraternity party. He said he told the woman he knew nothing about the party and closed his door.

While the jurors watched a movie Saturday night in one of the hotel rooms, a dance scene prompted Guillot to ask Faulkner if the dancer looked like the woman who had come to his room the night before. Deputy Marshal James Rea overheard the remark and asked Guillot what she was talking about; she repeated Faulkner's earlier statements. Rea told two other marshals about the statement, after which the three marshals asked Faulkner to step out of the room. When they asked him which

marshal he had told about the visit, Faulkner said he could not remember.

On Sunday morning one of the marshals told Deputy Marshal James Pleicones about Faulkner's statements. Faulkner repeated his story to Pleicones outside the presence of the other jurors. When Pleicones asked which marshal Faulkner had informed, Faulkner first said he had told Pleicones. After Pleicones denied being told, Faulkner said he must have told Deputy Marshal David Murphy. When Murphy also denied being told, Faulkner said he could not remember who he had told but added that juror Guillot would know. Pleicones then talked with Guillot alone, who recounted her jury room conversation with Faulkner but said she did not see Faulkner tell any marshals about the incident.

After the morning break on Monday, February 1, 1988, the district court recessed the trial temporarily to interview the marshals and jurors in chambers. The three marshals on guard duty during the Friday–to–Saturday overnight shift told the court they neither saw nor heard anyone walking on the balcony or knocking on the jurors' doors. The district court then interviewed Faulkner and Guillot separately. Faulkner described the visit and its aftermath again. Guillot confirmed the jury room conversation with Faulkner but stated that she did not think the visit had occurred. Guillot also stated that the Faulkner incident would not influence her ability to decide the case fairly and impartially. The court did not ask Faulkner whether he still could decide the case fairly and impartially.

The district court then excused Faulkner from the jury over Fryar's objection. The court concluded that Faulkner lied about the visit, had continued to lie in the face of questioning, and thus was not fit to serve as a juror. Alternate juror Eddie Rice took Faulkner's place and eventually became the foreman. The court denied Fryar's motion to remove Guillot from the jury.

The court then interviewed the remaining jurors separately about the incident. Five said they believed the visit had not occurred, five thought it had occurred, and three said they were not sure. All said the Faulkner incident would not affect their impartiality. The court admonished each juror individually not to discuss the interview with the other jurors.

After reconvening, the district court instructed all of the jurors with Fryar's consent to draw no conclusions or inferences from Faulkner's excusal. Fryar moved for a mistrial on grounds that the taint of Faulkner's dismissal persisted because five jurors believed his story about the visit. The court denied this motion and Fryar's renewed motion to excuse Guillot.

Fryar moved for a new trial after his conviction on grounds that the district court had excused juror Faulkner erroneously. During a post-trial hearing on the motion, Fryar presented Karen Gant and her sister, Juanita Woods, in an effort to prove that a woman had knocked on Faulkner's door early Saturday morning.

Gant testified that her sister had told her that a fraternity would be holding a party Friday night, January 29, 1988, in room 254 or 250 at the Holiday Inn in Monroe. She stated that she knocked on three or four doors in the 250–series while looking for the party; one person fitting the general physical description of juror Faulkner opened the door and told her she had the wrong room, according to Gant. She testified that she spoke loudly at the doors, saw no warning signs or open drapes, and saw nothing to distinguish the row of rooms from any other in the hotel.

Deputy Marshal Richard Frandsen also testified during the hearing about the placement of warning signs in the hotel stairwells. Frandsen, who was not on duty that Friday night, said he told each deputy of the sign requirement and, in anticipation of the fraternity party, warned them to be especially watchful Friday night. Frandsen stated that the warning signs were in open view each time he visited the hotel during the jury's sequestration. The district court concluded that Gant did not know for certain which doors she had knocked on that night and denied Fryar's new trial motion.

Following the sentencing and after filing notice of appeal, Fryar moved for release on bond pending appeal and filed a supplement to the motion. The supplement alleged that juror Eddie Rice had failed to disclose a prior conviction for driving while intoxicated after being asked on voir dire whether he had ever been convicted of or pled guilty to a crime. The court, with the parties' consent, treated the supplement as a motion for new trial and ordered a hearing. Rice acknowledged at the hearing that he had pled guilty to a D.W.I. charge in 1987. However, the court concluded that Rice had mistakenly but justifiably assumed that a D.W.I. conviction was considered a traffic offense rather than a crime, and denied Fryar's motion for new trial. Fryar appeals.

## II.

### 1.

■ In his first attack, Fryar seeks to portray the alleged visit to Faulkner as an extrinsic influence on a juror regarding a matter pending before the jury, which creates a rebuttable presumption of prejudice to the defendant. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *United States v. Webster,* 750 F.2d 307, 338 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). But the Faulkner incident is more properly characterized as juror misconduct given the district court's finding that the purported visit did not happen. As such, we review the district court's actions under the abuse of discretion standard. *See United States v. Dominguez,* 615 F.2d 1093, 1095 (5th Cir.1980); *United States v. Smith,* 550 F.2d 277, 285 (5th Cir.), *cert. denied sub nom. Wallace v. United States,* 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105 (1977). Further, the *Remmer* presumption of prejudice does not come into play here even if we assume that the contact occurred because absolutely no evidence suggests that the purported visitor tried to talk to Faulkner about the trial. *See Remmer,* 347 U.S. at 229, 74 S.Ct. at 451; *United States v. Burke,* 496 F.2d 373,

377 (5th Cir.), *cert. denied,* 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974).

■ Fryar, relying heavily on the testimony of Karen Gant, argues that the district court erred when it concluded that no visit occurred and dismissed juror Faulkner. We cannot agree that the district court's resolution of this fact issue, based on the conflicting testimony of Faulkner, Gant and the marshals, is "wholly unsupported by the evidence." *See United States v. O'Keefe,* 722 F.2d 1175, 1178 (5th Cir.1983); *United States v. Granza,* 427 F.2d 184, 185 (5th Cir.1970).

Gant's testimony about the incident was imprecise and uncertain. She recalled that she knocked on doors 254 and 250 while searching for the party, yelled or talked loudly through the hotel doors, and stated that a short and sleepy-looking black man answered door 250. She also stated that she saw no warning signs, marshals or open drapes. But Gant, who testified that she was "vague" about the details of her search because she was anticipating the party at the time, repeatedly said she was not sure about particular room numbers.

The district court was entitled to weigh this equivocal testimony against the statements of the marshals on guard duty that night. The marshals stated that (1) they heard and saw no visitors in the hall that night; and (2) the placement of their guard posts—one of which was three doors down from Faulkner's room—made it unlikely that a visitor could escape detection while knocking and yelling at the jurors' doors.

The marshal's testimony supports the district court's decision to reject Faulkner's testimony. The district court also was entitled to resolve the dispute about whether Faulkner reported the alleged visit to the marshals and conclude that Faulkner lied about reporting it. The court did not abuse its discretion in concluding that the visit did not occur and that Faulkner had lied.

■ The district court has the discretion to excuse an untruthful juror. *See Dominguez,* 615 F.2d at 1095; *Smith,* 550 F.2d at 285. Nor did the court exceed its discretion when it evaluated juror Guillot's

statements, accepted her pledge of impartiality and refused to excuse her for lack of candor or her contacts with Faulkner. Her conversations with the marshals and the court related to the Faulkner incident, not to Fryar's case.

■ Similarly, the scope of an investigation into juror misconduct rests with the court's discretion. *Tillman v. United States*, 406 F.2d 930, 938 (5th Cir.), *vacated on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). We detect no abuse of that discretion in the court's individual interviews with the jurors and marshals, or in its instruction that the jurors should draw no conclusions from Faulkner's dismissal. Nor do we detect any actual prejudice to Fryar from this incident. All of the remaining jurors affirmed their ability to decide this case impartially; we see no reason to doubt the district court's determination that they were sincere. *See Smith v. Phillips*, 455 U.S. 209, 217 n. 7, 102 S.Ct. 940, 946 n. 7, 71 L.Ed.2d 78 (1982).

■ We decline Fryar's invitation to presume that this juror misconduct prejudiced Fryar because the misconduct and investigation involved a sequestered jury hearing a jury tampering case. Fryar's reliance on *United States v. Shapiro*, 669 F.2d 593 (9th Cir.1982), is misplaced. In *Shapiro*, the Ninth Circuit held that the district court should have granted a mistrial after one juror attempted to extort money from a party in return for a favorable verdict. The Ninth Circuit concluded that the entire panel had been tainted because: (1) several jurors' responses to a special voir dire indicated that the jurors had discussed the case among themselves; and (2) the form of the

district court's voir dire questioning planted the idea in jurors' minds that out-of-court misconduct by the prosecution or the defendants had prompted the questioning.[1] Given this situation, the Ninth Circuit presumed that the defendants had been prejudiced. *Id.* at 603.

Fryar's case does not present such an egregious situation. The district court asked the jurors individually (1) what they had heard about the incident; (2) what inferences they drew from it; and (3) whether it would affect their ability to be fair and impartial. Unlike that court's questions in *Shapiro*, these generic questions do not suggest misconduct by either party.

■ Similarly, Faulkner's misconduct itself is insufficient to create a presumption of prejudice here. The Fifth Circuit considered *Shapiro* in a case in which a juror announced in the jury room before closing arguments had ended that the defendants "were guilty from day one [and] that he ... wasn't listening to the argument." *Webster*, 750 F.2d at 336. The court dismissed the offending juror, interviewed the remaining jurors individually and concluded that they had not been tainted. *Id.* at 337. In refusing to adopt *Shapiro*'s presumption of prejudice in these circumstances this court stated:

[S]itting as we do far from the daily rigors of trial, we are in a particularly inappropriate position from which to judge the effect of a juror's premature expression of an opinion as to guilt on the minds of the other members of the jury panel. That is precisely why we have traditionally left the manner of handling jury misconduct to the sound discretion of the trial judge.

1. The Ninth Circuit included this excerpt from the trial transcript:

THE COURT: Do you have any idea or suspicion about the reason for this questioning of you?
JUROR CHUMLEY: I really hadn't thought about it, but no, I don't. It does make a person wonder. There obviously has to be a reason.
THE COURT: Do you think this questioning has been occasioned by any out-of-court misconduct by the prosecution or any of the defendants?

JUROR CHUMLEY: Now this is what I should have been—normally would have been thinking about during lunch and everything, but we had a large lunch and we have been playing cards and I really had not thought about it.
THE COURT: I am just planting thoughts in your mind, huh?
JUROR CHUMLEY: In a sense, yes.
*Shapiro*, 669 F.2d at 601. Another juror responded unequivocally that she did believe a party's misconduct had prompted the court's questioning. *Id.* at 602.

*Webster*, 750 F.2d at 338 (citations omitted). This reasoning applies with equal force to Fryar's situation.

■ Finally, Fryar asks us to find prejudice in the marshals' interviews with Faulkner and Guillot on Saturday and Sunday. Once again we perceive no abuse of discretion in the district court's refusal to grant a new trial based on these contacts. *See United States v. Albert*, 595 F.2d 283, 290 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979). We also note that Fryar has waived any argument to excuse Guillot based on the contacts with marshals because he made no motion below to excuse her on these grounds.

### 2.

■ Fryar argues that juror Eddie Rice's failure to disclose on voir dire a prior conviction for driving while intoxicated denied him the right to an impartial jury. We review the district court's refusal to grant a new trial on these grounds for abuse of discretion. *United States v. Fowler*, 735 F.2d 823 (5th Cir.1984).

At the post-trial hearing Rice admitted that he had pled guilty to a D.W.I. charge in 1987. However, he stated that he did not remember hearing the question about prior convictions when the district court asked it generally of the jurors. Rice also stated that if he had heard the question he would have considered D.W.I. to be a mere traffic violation rather than a "crime;" he added that his lawyer told him it counted as a traffic violation.

The court concluded that Rice probably heard the question but did not purposely answer it untruthfully. The court noted a possible source of Rice's confusion in its colloquy with another juror; when that juror asked if traffic violations counted as "crimes," the court responded that speeding was not a crime. Under these facts we perceive neither an abuse of discretion by the district court nor any reason to presume bias to Fryar from Rice's inaccurate answer. *See United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir.1976). Thus, we find no merit in Fryar's companion argument that Rice's inaccurate answer impaired Fryar's ability to exercise his peremptory challenges.

### 3.

In his next point, Fryar claims that the district court improperly excluded evidence of prior grand jury testimony during his cross-examination of Richard Davis, who testified for the government under a grant of immunity. Davis testified that Fryar asked him to find a way to contact three jurors and get them to vote in Fryar's favor in the civil case. During an offer of proof outside the jury's presence, Davis stated that he had testified before grand juries in 1960, 1972 and 1983 or '84; he testified under a grant of immunity at the 1972 grand jury appearance. The district court, finding that the potentially-prejudicial effect of the testimony exceeded its probative value, excluded the testimony under Fed.R.Evid. 403.

■ The scope of cross-examination and its limits rest with the district court's discretion. *United States v. Balliviero*, 708 F.2d 934, 940 (5th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 351, 78 L.Ed.2d 316 (1983). Fryar argues that Davis' prior grand jury appearances were crucial to his theory that Davis acted on his own in trying to bribe the jurors because he knew he could make a deal with the government if he got into trouble. We find no abuse of discretion in the court's conclusion that the danger of prejudice from evidence of a fifteen-year-old grant of immunity and two unrelated grand jury appearances dating back twenty-eight years outweighed the probative value. This history provides no significant support to Fryar's argument that the government would approve future grants of immunity.

### 4.

■ Finally, Fryar claims that the district court infringed his sixth amendment right to confront witnesses when it denied his request to reveal a confidential informant's identity.

Under *Roviaro v. United States*, 353 U.S. 53, 62, 77 S.Ct. 623, 628, 1 L.Ed.2d 639

**856**

(1957), courts must make disclosure decisions by balancing the individual's right to prepare a defense against the public interest in encouraging the flow of information from informants by preserving their anonymity. In applying this test, this court has held that *Roviaro* does not require the disclosure of the identities of "mere tipsters." *United States v. Fischer*, 531 F.2d 783, 787 (5th Cir.1976); *see also United States v. De Los Santos*, 810 F.2d 1326, 1334–35 (5th Cir.) (informant's privilege overrides sixth amendment right to confrontation), *cert. denied*, —— U.S. ——, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987).

After reviewing the sealed F.B.I. documents included in this record and the edited transcript from the civil trial hearing at which the F.B.I. first brought the information to light, we conclude that the informant was a tipster. The district court did not err in denying disclosure of the tipster's identity.

The court's judgment of conviction is AFFIRMED.