# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-41274

United States Court of Appeals
Fifth Circuit

**FILED**
January 24, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

>    Plaintiff - Appellee

v.

ROGELIO RAMOS, JR.,

>    Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 7:17-CR-128-3

Before HAYNES, GRAVES, and DUNCAN, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:*

Rogelio Ramos, Jr. appeals the judgment of the district court sentencing him to ninety months of imprisonment for conspiracy to commit wire fraud. He argues that (1) the district court erred in dismissing one of the jurors ("Juror 13") during deliberations; (2) the district court erred in allegedly refusing to dismiss another biased juror; and (3) he received ineffective

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-41274

assistance of counsel. Because we conclude that the district court abused its discretion, we VACATE and REMAND.

## FACTS AND PROCEDURAL HISTORY

Rogelio Ramos, Jr., and two others were indicted for conspiracy to commit wire fraud. Ramos pleaded not guilty and proceeded to a jury trial along with a codefendant.

On the first day of trial, before the jury was seated, the district court informed the parties that it had received a letter from a female juror stating that she learned that a coworker would be testifying during the trial. The prosecutor responded that the coworker/witness had likewise informed him that she knew a juror. As a result, the prosecution said it planned to remove that witness from the witness list.

On the third day of trial, the district court informed the parties, outside the presence of the jury, that it needed to address the issue of the juror who worked with the Government witness who was a victim of the fraud but was ultimately not called to testify. After lengthy discussions regarding the identities of the witness and the juror, the process by which the district court would determine if the juror was impartial, related evidentiary issues, and repeated requests by defense counsel for a mistrial and to excuse the juror, the prosecutor interjected that he was unopposed to the court's dismissing the juror. The district court dismissed the juror, and an alternate juror ("Juror 13") was seated as her replacement.

Following several days of testimony, the case was submitted to the jury. After the jury deliberated for a few hours, the district court received a note stating, "Jurer [sic] #13 wants to know if we have to deliberate today or if we can recess till tomorrow. He has a headache and wishes to leave." The court agreed to release the jury for the evening.

2

No. 17-41274

The jurors sent various notes the following day.  The first note at 10:55 a.m. said: "Your Honor, what steps can be taken when the majority of the jury realize that a juror can not make an impartial decision based on evidence provided?  Juror based decision on assumptions and on defendant's thinking."  The court addressed the jury and encouraged them to continue deliberations.  The court also noted that:

> The court has received jury note number 3 which reads as follows, "Impasse."  The court could hear that the discussions have become *very vocal and angry*, so I asked the marshals to step into the room and make sure everything was okay.  And the foreperson stepped out and said *it was not okay*, and that they were at an impasse and so I said, well you need to communicate with – that to me in writing if that's the case.  So that's why this note just says one word impasse.

(Emphasis added).

The jury sent a few more notes that afternoon indicating they were at an impasse.  During this time, defense counsel moved for a mistrial.  The court denied the motion and gave an *Allen* instruction.  *See  Allen v. United States,* 164 U.S. 492 (1896).  Thereafter, the district court revealed a conversation with Juror 13, who approached the judge before returning to deliberate, regarding verbal attacks by other jurors who "got in his face."  Juror 13 also indicated he felt uncomfortable going back into the deliberation room and wanted to make sure the marshals would be outside the door.

The foreperson subsequently sent a note and asked to meet with the court.  The judge met with the foreperson in his chambers and then later informed the parties he had received a note and had met with the foreperson.  The court recounted to the parties the various allegations the foreperson made to him regarding Juror 13, i.e., that he: (1) refused to look at the evidence; (2) asked other jurors to look at evidence outside the trial evidence; (3) had a note that said "Perez Rick is number 1, what else is there to know or what else is

3

there to do"; and (4) complained of being disabled and suffering from headaches, was taking various medications, and had short-term memory loss.

The district court said that it was going to have the foreperson repeat the allegations for the record. The district court also provided the parties with a "well wishing" card which contained a "religious message." Juror 13 had given that card to all of the other jurors. The district court said the card had no bearing on the issue of Juror 13's dismissal. Importantly, the district court did not disseminate the note allegedly written by Juror 13 about defense counsel, "Perez, Rick." Instead, the court merely recounted the foreperson's uncorroborated allegation.

The court said that based on the foreperson's uncorroborated allegations regarding Juror 13, there was cause to dismiss him. Defense counsel objected and unsuccessfully moved to dismiss the jurors who were allegedly abusing Juror 13. The court placed the foreperson under oath and asked him to repeat his concerns about Juror 13. The foreperson claimed that Juror 13 refused to acknowledge the evidence and that he readily dismissed it, saying "he wants to take a position based on [the district court interjected "things –" here] assumptions." When the district court asked, "[a]ll right. Does he want to -- does he bring in things that were not part of the evidence that he would like for you all to base your decision on?" The foreperson answered, "[y]es. He's expressed –" before being interrupted again by the district court and told not to finish. At this point, defense counsel unsuccessfully objected to the court leading the witness. The foreperson reiterated his claim, although with slightly different language than the court indicated, that he had seen a note inside Juror 13's clear binder that said: "Perez, Rick, he is number one -- he is number one, and then it said what else, is there more to say." The foreperson also alleged that Juror 13 mentioned that he had "short-term memory" and

headaches, "so he has a hard time grasping, understanding the subject we're telling him."

Defense counsel then asked the court to address the alleged threats against Juror 13. The court refused, responding that based on the previous conversation with Juror 13, the court did not believe he was credible or that he had been threatened. The court said it did not believe what Juror 13 said without it being verified by someone else. Yet, the court would not allow anyone other than the foreperson an opportunity to corroborate or deny Juror 13's claims. The court also did not allow Juror 13 an opportunity to fully explain his concerns or to respond to the foreperson's allegations. Further, the court said that the marshals had checked on the jurors after the court heard them arguing loudly, and the marshals confirmed that "everything was fine." This is contrary to the district court's previous statement regarding the "very vocal and angry" deliberations and the fact that everything was "not okay."

The foreperson elaborated on his statements regarding Juror 13, explaining that several jurors told Juror 13 that they "needed to use the evidence to come to a conclusion." But Juror 13 "was adamant about not looking at the evidence . . . and he just kept dismissing it." In explaining what he meant by this, the foreperson indicated that Juror 13 was giving more credibility to the defense arguments than the other jurors wanted him to.[1] The foreperson described the deliberations as "very intense" and heated. He stated

---

[1] The dissenting opinion's reference to the play/movie *Twelve Angry Men* is surprising. Obviously, it is a fictional jury, but if we indulge the reference for the moment, it supports the majority opinion, not the dissenting opinion. It demonstrates the importance of each juror to the outcome of a case and the fact that one juror can sway the other eleven. Had the judge in that play eliminated Juror No. 8 early on, as many of his fellow jurors would have supported at the time, the defendant would have been convicted. Instead, one by one, Juror No. 8 convinced the other to acquit. While *Twelve Angry Men* is fictional, the fact that one juror can influence the others and should not be lightly eliminated from the panel is not.

No. 17-41274

that nobody had threatened Juror 13, but that Juror 13 had caused several other jurors, including the foreperson, to become frustrated, heated, loud and tearful because of his refusal to agree with them.  The court sent the foreperson back to the jury room with instructions to discontinue deliberations.  Perez had previously acknowledged that he and Juror 13 knew each other from high school.  Further, Juror 13 acknowledged during voir dire that he knew Perez and said he could be fair and impartial.

Defense counsel then unsuccessfully moved for a mistrial based on a hung jury and the misconduct of the other jurors.  Instead, upon request of the government and without further investigation, the district court dismissed Juror 13 for good cause citing his misconduct and inability to participate meaningfully in deliberations.  The court summarized that Juror 13's note referencing Perez indicated bias toward the defense, that he relied on evidence outside the record when deliberating, that he refused to examine the evidence and participate, and that he was disabled and suffered from various medical problems.  Defense counsel requested an evidentiary hearing, including an interview of the juror.  The court denied the request.  The remaining eleven-person jury found Ramos guilty.  He was sentenced to ninety months of imprisonment, to be followed by five years of supervised release.  Ramos then filed this appeal.

## STANDARD OF REVIEW

A district court may dismiss a juror for "good cause" after trial has begun. Fed. R. Crim. P. 23(b)(2)(B).  This court reviews a district court's decision to dismiss a juror for abuse of discretion.  *United States v. Pruett*, 681 F.3d 232, 247 (5th Cir. 2012) (per curiam).  "A district court abuses its discretion only when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence."  *United States v. Ebron*, 683 F.3d 105,

6

No. 17-41274

126 (5th Cir. 2012). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* at 126-27.

This court has said that "[a] district court's decision to remove a juror is discretionary whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired." *United States v. Virgen-Moreno*, 265 F.3d 276, 288 (5th Cir. 2001) (internal marks and citations omitted). This court has also said that "[a] juror's inability to follow instructions is a legally valid basis for dismissal. Similarly, a lack of candor can also serve as the basis for dismissing a juror." *Ebron*, 683 F.3d at 127 (internal citations omitted). This court will not disturb a district court's decision to remove a juror unless the removal prejudiced the defendant. Prejudice will be found "if the juror was discharged without factual support or for a legally irrelevant reason." *United States v. Virgen-Moreno*, 265 F.3d 276, 288 (5th Cir. 2001).

This court has recognized, without adopting, the rule in several other circuits that "a court may not dismiss a juror based upon its conclusion that the juror is failing to participate in the deliberative process in accordance with the law unless there is *no possibility* that the juror's problem stems from his view of the sufficiency of the evidence." *Ebron*, 683 F.3d at 127 (emphasis added) (quoting *United States v. Edwards*, 303 F.3d 606, 633 (5th Cir. 2002)). This court concluded in *Ebron* that "the 'no possibility' rule is triggered only when the district court dismisses a juror based on its 'conclusion that the juror is failing to participate in the deliberative process in accordance with the law.'" *Ebron*, 683 F.3d at 127 (quoting *Edwards*, 303 F.3d at 633); *see also United States v. Patel*, 485 F. App'x 702, 713 (5th Cir. 2012). This court has said that "'Rule 23's good cause standard' still applies when the district court offers reasons other than those implicating deliberation." *Patel*, 485 F. App'x at 713 (quoting *Ebron*, 683 F.3d at 128).

7

No. 17-41274

## DISCUSSION

*\* Juror 13*

Ramos asserts that the district court abused its discretion by dismissing Juror 13. Specifically, Ramos asserts that the court erred by relying on the foreperson's statements regarding Juror 13 without also interviewing Juror 13 or any other jurors to confirm the veracity of the foreperson's assertions. Ramos contends that Juror 13 was simply viewing the evidence as he saw fit and drawing his own conclusions, which frustrated the other jurors. Ramos also points out that the foreperson stated that Juror 13 had "short term memory" rather than "short term memory loss." This, he argues, leads to confusion about whether Juror 13 actually had short-term memory loss affecting his capacity to deliberate. This confusion, he argues further, should have been clarified through investigation. Finally, Ramos asserts that the other jurors attempted to bully Juror 13 into submission and that the district court failed to investigate that claim.

While the scope of an investigation into juror misconduct is within the discretion of the district court, the applicable authority requires that there be an investigation. *See Patel*, 485 F. App'x at 712; *Virgen-Moreno*, 265 F.3d at 288; and *United States v. Fryar,* 867 F.2d 850, 854 (5th Cir. 1989).[2] Further, "[s]uch an investigation may be conducted via careful juror questioning or any other appropriate means." *Ebron*, 683 F.3d 105, 125.[3]

---

[2] The dissenting opinion concedes that the applicable authority requires an investigation, but then takes issue with there being a threshold of an investigation. In doing so, the dissenting opinion misapprehends the applicable law by suggesting our cases actually say that the decision of whether to conduct an investigation into juror misconduct rests with the court's discretion. However, there is no authority for any such conclusion.

[3] Likewise, in the civil case of *United States v. Hodge*, Case No. 17-20720, --- F.3d ----, 2019 WL 3727775, \*\*8-9 (5th Cir. Aug. 8, 2019), there was a thorough investigation. In *Hodge*, the court questioned the juror against whom allegations were made as well as all of the other jurors before determining that there were various reasons to remove the juror in question independent of the deliberative process. *Id.* at \*\*8-9.

No. 17-41274

In *Patel*, the district court "properly investigated juror conduct" after receiving a note from a juror by giving both parties an opportunity to review and research the issues of law raised in the note, hearing arguments on those issues, and posing five questions using language proposed by the parties to each juror. *Id.* at 712-13. The district court there indicated that it was "'loathe to excuse a juror in a criminal case,' but credited the eight jurors who testified that Juror 9 refused to deliberate and that, when questioned, she had lied." *Id.* at 713.

Here, Juror 13 was removed based on allegations of debilitating health issues, a pro-defense bias, and because he refused to consider the evidence and deliberate. All of this information came from uncorroborated allegations made by the jury foreperson. Juror 13 had a headache once at the end of a long day. On Thursday, May 25, 2017, the last day of the trial, the jury began deliberating at approximately 4:30 p.m. The district court told the jury:

> All right, so I'm going to dismiss you to begin your deliberations. I'd like for you-all to work as late as you reasonably can. But I understand people have commitments, so I'm just going to ask you to do the best you can. If you're close, then I'll ask, you know, stay a little longer. If you're not, then a reasonable hour – can we be at least until 5:30ish. Okay, I mean you-all talk about it.

The district court also instructed the parties to "[p]lease stay nearby. They're not going to stay that long."

At 7:15 p.m., Juror 13 inquired as to whether the jury had to continue deliberating that night or if they could recess until the following morning because he had a headache. This was well past the time the court had instructed the jury they would be finished. Additionally, Juror 13's request was pursuant to the court's instruction that jurors just needed to say "we'd like to retire for the evening" when they wanted to retire for the evening. This in no way establishes that Juror 13 had any health issue that precluded him from

9

deliberating.  Also, there is absolutely no evidence in the record that Juror 13's alleged disability in any way interfered with his ability to deliberate.  Juror 13 simply had a headache one day after deliberating well past the time the court told jurors they would be finished.  The district court also characterized the request at the time as being due to "just long day" that was "becoming an endurance test."  This is contradictory to the allegations made by the dissenting opinion.

The following day, after the district court had decided to remove Juror 13 and denied the request for an investigation by the defense or for it to be allowed to make a record, the court "elaborated" on its explanation for the earlier request to end deliberations for the day.  The court said that Juror 13 had indicated his need for regular rest and declined the offer of Tylenol.  But the court also referenced the reasons it did not find Juror 13 credible, saying:

> Yeah, I don't find -- he didn't – I did not find to be a credible juror because for various reasons. He disclosed to the Court that he suffered from various medical problems and that he'd disabled [sic] and I think the record will reflect he was unemployed, he walks with a cane – he described that he suffered -- and he was appreciative of the Court when I told him that we can accommodate him, he could stand, and he thanked me for that.
> He -- I mean, I could describe his mannerisms.  He's -- in his discussions with the Court, he advised the Court that he -- that his health is a large issue for him, and he spends his days caring for himself and making sure that his health is his first priority, this includes regular rest, and taking various medications. He wanted to not continue for the day because he said he suffered from headaches, and that he would get headaches, and when he would, he would generally like to go to sleep and take a nap.

However, all of those reasons would have been disclosed during voir dire and the court found none of them to be a basis for striking Juror 13 for cause.[4]

---

[4] Furthermore, in this era where the law, by way of acts such as the Americans with Disabilities Act, recognizes that people with disabilities can (and do) perform a myriad of

Additionally, there was no evidence that any disability or condition had worsened. Moreover, the court offered no explanation as to how a disability or walking with a cane would affect Juror 13's credibility.  In any event, the record is unclear as to whether the district court actually met with Juror 13 multiple times without disclosing it to the parties or if the court was combining information gathered during voir dire with the note to recess for the night and the conversation regarding verbal attacks.  What is clear is that, despite the dissenting opinion's characterizations, the district court never had any "face-to-face interaction" with Juror 13 regarding any of the foreperson's allegations against him.

There is also no evidence that Juror 13 had a pro-defense bias or that he refused to consider the evidence and deliberate.  There is an uncorroborated allegation by one juror about an awkwardly worded, somewhat bizarre note referencing defense counsel.  The existence of this alleged note was never verified, and the note was not provided to the parties.  Both Juror 13 and Perez had previously fully disclosed their association.  Further, Juror 13 affirmed he could be impartial despite that association.  Also, the foreperson's allegations provided no specific information as to what Juror 13 was refusing to consider or how he was refusing to deliberate.  The allegations instead indicated that Juror 13 sided with the defense and simply would not agree with the other jurors no matter how much they yelled and cried.

Allowing the court discretion to determine the scope of an investigation does not mean the court may refuse to conduct any investigation and remove

---

important jobs and tasks, the dissenting opinion's acceptance of the district court's notion that a vague suggestion of "disability" should cause the elimination of a juror is disturbing.  If a "headache" and some "forgetfulness" were enough to eliminate a juror, we would have few jurors left.  While there certainly could be mental or physical disabilities of such a type as to render a person unable to serve, much greater evidence than that suggested here must be presented.

the juror anyway. There has to be an investigation to determine misconduct. The district court had only the uncorroborated statements of the jury foreperson but then failed to do any investigation. *Ebron* does not stand for the proposition that it is proper for the district court to refuse to do any investigation and to accept only allegations from one juror who clearly had animosity toward Juror 13. Other than the jury foreperson's uncorroborated statements, there is absolutely nothing in the record to establish that it was plausible that Juror 13's alleged bias, health issues, and refusal to deliberate warranted dismissal. Again, the district court never had any face-to-face interaction with Juror 13 regarding the foreperson's allegations.

There was no factual support for the district court's decision. Where a juror is discharged without factual support, prejudice must be found, and this court must conclude that the district court abused its discretion. *Virgen-Moreno*, 265 F.3d at 288. Notably, in *Virgen-Moreno*, a note from one juror, Juror Collins, was sufficient because Juror Collins said she, herself, was having difficulty concentrating as a result of three deaths of family members and friends during the week and she asked to be excused approximately 15 minutes after the jury retired to deliberate at 11:30 a.m. until the following Monday. Here, Juror 13 said no such thing. In fact, Juror 13 was not even asked.

The district court abused its discretion by failing to do any investigation. The district court heard the foreperson's allegations and did nothing to confirm or corroborate those allegations. The court did not interview Juror 13 or any other jurors regarding these allegations. This is odd considering the court's adamant intention to just merely talk to the biased juror that Juror 13 replaced and to rely solely on her representation of whether she could be impartial regardless of the fact that she was dishonest during voir dire. The court only removed that juror because even the government eventually agreed to

No. 17-41274

dismissal.    But, here, the court refused to investigate the foreperson's allegations and presumed them true without even asking Juror 13 or any other jurors.  The court also failed to investigate Juror 13's claims regarding the verbal attacks by other jurors and pressure to just agree with them.  The court also made conflicting statements regarding whether everything was "okay" in the deliberation room.

For these reasons, we conclude that the district court abused its discretion in removing Juror 13.

\* *Juror bias*

Ramos asserts that his right to an impartial jury was violated because the district court failed to initially dismiss a juror who worked with a government witness/victim, to disclose evidence of potential bias known only to the court and the government, and to conduct a hearing regarding the juror's potential bias.  Ultimately, it was the dismissal of this juror which led to the seating of Juror 13.  While we do not decide whether this constituted an abuse of discretion, the circumstances surrounding the removal of this juror were also briefed and raised on appeal.  We discuss those circumstances only to highlight the stark contrast between the district court's handling of this juror and its handling of Juror 13.

A defendant has a Sixth Amendment right to an impartial jury.  *See United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000); *United States v. Cooper*, 714 F.3d 873, 878 (5th Cir. 2013); and U.S. Const. amend. VI.  This court has said: "Actual bias exists when the juror failed to answer a material question honestly on voir dire, and a correct response would have provided a valid basis for a challenge for cause." *Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009) (citations omitted).  "A claim of alleged bias is ordinarily addressed in a hearing where the judge examines the juror and obtains assurances of the juror's impartiality." *Id.* (citations omitted).  Further, there

13

are instances where a juror can be presumed biased as a matter of law. *See Solis v. Cockrell*, 342 F.3d 392, 395-98 (5th Cir. 2003); *see also Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring).

Prior to the start of trial on day one, the district court considered a motion in limine by the defense regarding a number of witnesses the government had failed to identify to the potential jurors. This identification was to allow the potential jurors to indicate any relationship or any association with any witnesses so the court could determine whether any potential jurors needed to be excused for cause or the defense could decide to exercise a peremptory challenge. Essentially, the government had interviewed witnesses and supplemented their witness list after jury selection with five or more new witnesses they planned to call to testify.

Since a jury had already been seated, the court decided it would later ask the already-selected jurors about the additional undisclosed witnesses and then determine what to do because it was too late for the defense to exercise its peremptory challenges at that point. The court then disclosed that it had "received a letter from a juror advising the Court that she was made aware by a co-worker that the co-worker was going to be testifying in Federal Court on Tuesday." The government then acknowledged that it had been informed by the witness, a victim in this case, that she knew someone who was on the jury. The government said that, as a result, it would not call that particular witness but refused to identify the witness.

The court continued with its plan to inquire, at some point, as to whether any juror had knowledge of the new witnesses. The court did not disclose the identity of the juror who had written the letter and did not require the government to disclose the identity of the victim/witness. In the meantime, the trial commenced.

On the second day of trial, the defense again asked for the identity of the witness who worked with a juror. The court countered that the government would not be calling the witness. The defense explained that they could only take it "on faith" that the government was not actually going to call that witness because they did not know the identity of the witness to be able to verify that the witness would not be called to testify. Despite the fact that the court knew the identity of the juror and the government knew the identity of the witness, the court determined that the defense did not need to know the identity of either. There was then a discussion regarding whether the identity of the victim/witness was disclosed to the jury. The district court and the government, via two different prosecutors, repeatedly maintained that the identity of this witness was not disclosed to the jury. The defense then asked for a stipulation to be placed on the record. The district court replied: "All right. Then we will place it on the Record in due course and maybe I can have you all give it to me in-camera to make sure that this isn't a witness that you call."

The court finally said that the government would go ahead and give him the name and he would "review the voir dire to see if that person was read off. I mean, you all gave me a list of what was read, but then you gave me another list that over a hundred people and I don't know which list is accurate anymore." The court then addressed other unrelated issues and the trial proceeded.

Later that afternoon, the court called a bench conference on the juror issue and acknowledged that the name of the witness/victim was indeed read to potential jurors and the juror who was a coworker failed to acknowledge during voir dire that she knew and worked with the witness/victim. Instead, apparently the witness and juror later somehow conveyed to one another that each was involved in the case and eventually decided at some point over the

next few weeks to inform the court and the government. The jury was selected on May 2, 2017, and then excused until May 16, 2017, for trial. But, again, we do not know exactly when the court was notified by the juror and when the government was notified by the witness.

The defense then asked that the juror be excluded, arguing that under this court's case law, there is bias if the juror fails to answer the question. *See Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009) ("Actual bias exists when the juror failed to answer a material question honestly on voir dire, and a correct response would have provided a valid basis for a challenge for cause."). The court indicated that the juror and witness both worked at a school. The district court eventually said that if there was "any issue with the juror, then my intention is to speak to the juror" to determine why she did not acknowledge her co-worker during voir dire.[5] The defense then moved for a mistrial.

Even after it was revealed that the juror failed to acknowledge her relationship with a witness during voir dire, the district court continued to suggest reasons for the failure. The court then revealed that he also knew the juror and her husband and said they are a prominent family in McAllen. The government then posited, "[i]t's just starting to raise a lot of issues and concerns, Your Honor. I mean –" which the court interrupted with, "And it's a very prominent family in this community, McAllen." The defense again moved for a mistrial. At various times, the defense tried to explain that, in addition to the juror's failure to acknowledge the relationship, the intense media coverage of this case would make it highly unlikely that this juror would vote in a way that would negatively affect her coworker.

---

[5] This is different from the district court's handling of Juror 13 during deliberations.

The district court finally said, "[w]e can look at all of this tomorrow morning." The jury was brought back in and the trial re-commenced. On the third day of trial, the district court stated:

Before we bring in the jury, I feel like we needed to resolve the issue of what to do, if anything, with regard to a juror who is acquainted with a victim whose name was read during the voir dire as being a potential witness, and who did not make any response to that question asking about if anyone was acquainted with these witnesses. So I feel like I needed to address with her this morning.

The court asked if anyone objected to addressing this matter with the juror. The defense said that it needed to state some objections on the record. The defense also explained the reasons supporting the removal of the juror.

After much discussion, the court denied the motion to strike the juror and the motion for a mistrial. The court then recounted plans to have an informal discussion with the juror in chambers because he knew her personally. The defense asked for a record. The judge indicated that he could not do that in his office but said maybe he could record it with his cell phone or something. Then it was decided that the juror would be questioned in the courtroom. The court said:

I'm going to have her brought to my chambers. I'm going to let her know that I'm going to bring her into the courtroom because that's the only place we have a recording device, and I need to ask her a few questions about this, and then we'll bring in here. I'll just sort of ask her informally. When I'm done I'll invite you all in, we can play it back or I can just tell you what she said.

The court then acknowledged that he was "not really sure" about what to ask the juror. After additional discussion with the court, the government eventually said, "to cut through these issues," it was unopposed to this juror's dismissal. Since the defense had repeatedly moved for dismissal, the court

finally agreed to dismiss the juror now that the government also agreed. Juror 13, an alternate, was then seated.

Based on our case law, it is clear that this juror was biased because she failed to acknowledge that she knew and worked with one of the victims/witnesses. *See Hatten*, 570 F.3d at 600. So, the question then becomes whether the presence of this juror for three days of the trial had any potential to taint the remaining jurors. Although the juror was eventually dismissed, it took days of delay to get to that point and it was only done then because the government finally decided not to oppose dismissal. The tardy removal in no way minimizes any impact that juror may have had on the rest of the panel during the course of the trial. Additionally, it is unclear at what point the court learned of the problem. The court would not release to counsel the juror's letter to him.

Because we have already decided that the dismissal of Juror 13 was reversible error, we do not decide this issue.

 * *Ineffective Assistance of Counsel*

Ramos asserts that counsel rendered ineffective assistance by (1) failing to advise Ramos that he should attend jury selection; (2) representing Ramos despite a conflict of interest; (3) leaving the courtroom during the Government's case in chief; and (4) failing to lodge certain objections and to adequately examine a witness.

The Supreme Court has emphasized that a 28 U.S.C. § 2255 motion is the preferred method for raising claims of ineffective assistance of counsel. *Massaro v. United States*, 538 U.S. 500, 503-09 (2003). This court generally declines to review ineffective assistance claims on direct appeal. *United States v. Isgar*, 739 F.3d 829, 841 (5th Cir. 2014). We have "undertaken to resolve claims of inadequate representation on direct appeal only in rare cases where the record allowed us to evaluate fairly the merits of the claim." *United States*

*v. Higdon*, 832 F.2d 312, 314 (5th Cir. 1987). In most instances, we qualify a claim as a "rare case" warranting review only when it was raised and developed in a post-trial motion to the district court. *United States v. Stevens*, 487 F.3d 232, 245 (5th Cir. 2007). Ramos did not raise his ineffective assistance claims in the district court at any time. Because the record is not sufficiently developed to allow for a fair consideration of the claims, we decline to consider them on direct appeal without prejudice to his right to raise the claims on collateral review. *See Isgar*, 739 F.3d at 841.

## CONCLUSION

For the reasons set out herein, we VACATE AND REMAND.

No. 17-41274

STUART KYLE DUNCAN, Circuit Judge, dissenting:

In the classic 1957 movie *Twelve Angry Men*, Henry Fonda plays Juror #8, the holdout whose relentless focus on the evidence ultimately persuades fellow jurors of the defendant's innocence. His nemesis is Juror #3, played by Lee J. Cobb, who nurses a bias against the defendant, ignores evidence, and browbeats other jurors. But not every holdout juror is Henry Fonda. Some may be Lee J. Cobb. In this case, the district court dismissed Juror #13, finding him more Cobb than Fonda. Our precedent allows the district court to make this decision even if the recalcitrant juror turns out to be the only one standing between the defendant and a guilty verdict. *See United States v. Edwards*, 303 F.3d 606, 634 (5th Cir. 2002) (noting that "we have previously made clear that hold-out jurors are not immune from dismissal based upon just cause" (citing *United States v. Huntress*, 956 F.2d 1309, 1312–13 (5th Cir. 1992)).

Appellate judges must defer to the district court's on-the-ground discretion in making these sensitive calls. We have "emphasize[d] that a district court, based on its unique perspective at the scene, is in a far superior position than [we are] to appropriately consider allegations of juror misconduct, both during trial and during deliberations." *United States v. Ebron*, 683 F.3d 105, 126 (5th Cir. 2012) (quoting *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006)). Based on that deferential posture, I would find the district court did not abuse its discretion when it dismissed Juror #13. The court made findings sufficient to show good cause for dismissal, and those findings were plausible in light of the record as a whole. Specifically, the court's findings were supported by sworn testimony from the jury foreperson, face-to-face interaction with Juror #13, and facts confirmed by defense counsel.

I respectfully dissent.

No. 17-41274

I.

As the majority opinion correctly notes, Maj. Op. at 6, a district court may dismiss a juror for good cause even after trial has begun. Fed. R. Crim. P. 23(b)(2)(B). Valid grounds for dismissal include "[a] juror's inability to follow instructions," *Ebron*, 683 F.3d at 127 (citing *Edwards*, 303 F.3d at 631), and "a lack of candor." *Id.*; *see also, e.g.*, *United States v. Fryar*, 867 F.2d 850, 853 (5th Cir. 1989) (explaining that "[t]he district court has the discretion to excuse an untruthful juror"). The majority also recites the correct standard of review: we review a district court's decision to dismiss a juror for abuse of discretion. Maj. Op. at 6 (citing *United States v. Pruett*, 681 F.3d 232, 247 (5th Cir. 2012) (per curiam)). "A district court abuses its discretion only when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Ebron*, 683 F.3d at 126. "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* at 126–27.

The parties do not dispute that the district court made factual findings in support of dismissing Juror #13 or that, if true, those findings are legally sufficient to show good cause. Instead, the only dispute is whether the findings themselves are supported by the evidence. The proper question before us, then, is not whether the district court's findings are the best conclusions it could have drawn but instead whether those findings are "clearly erroneous." *Ebron*, 683 F.3d at 126. If the findings are "plausible in light of the record as a whole," there is no clear error and therefore no abuse of discretion. *Id.* at 126–27.

II.

In dismissing Juror #13, the district court articulated four distinct findings on the record. It found that Juror #13 (1) refused to examine the evidence and participate in deliberations with fellow jurors, (2) attempted to rely on evidence outside the record, (3) indicated bias toward defense counsel, and (4) suffered from health issues, including headaches and a short-term

21

memory problems, that interfered with his ability to deliberate. While the district court primarily relied on the jury foreperson's sworn on-the-record testimony for these findings, the court also drew from its face-to-face interaction with Juror #13 (which the court recounted on the record) and from defense counsel's statements confirming information revealed during *voir dire*.

With respect to Juror #13's bias and refusal to deliberate, the foreperson testified that Juror #13 failed to follow instructions by refusing to consider the evidence and by relying on outside evidence. According to the foreperson, several jurors reminded Juror #13 that the group "needed to use the evidence to come to a conclusion," but Juror #13 "was adamant about not looking at the evidence" and "just kept dismissing it." The foreperson stated that during the "intense" deliberations no one had threatened Juror #13, but that Juror #13 had caused other jurors to become frustrated and cry based on his refusal to follow the court's instructions to consider the evidence. *See, e.g., United States v. Fattah*, 914 F.3d 112, 149 (3d Cir. 2019) (explaining that good cause for dismissal exists under Rule 23(b) "where a juror refuses to apply the law, refuses to follow the court's instructions, refuses to deliberate with his or her fellow jurors, or demonstrates bias") (citations omitted).

The foreperson also stated that Juror #13 had penned a note saying "Perez"—the defendant's counsel—was "number one . . . what else is there." The court connected this back to *voir dire* when Juror #13 had admitted knowing Perez. According to the court, the *voir dire* admission took place off the record during a bench discussion, and nothing suggests the foreperson knew about it. After the court heard the foreperson's testimony about the note, Perez confirmed on the record that he knew Juror #13 along with his wife and son and that they had a connection from a prior criminal case. Even though during *voir dire* Juror #13 had professed an ability to remain unbiased, the new evidence about the note undermined that claim and supported the court's

finding that Juror #13 had a pro-defense bias. *See, e.g., United States v. Thomas*, 116 F.3d 606, 613 (2d Cir. 1997) (noting that "Rule 23(b) dismissals have been upheld repeatedly in cases where the trial court found that a juror was no longer capable of rendering an impartial verdict" because, *inter alia*, a juror was "discovered to have a relationship with one of the parties") (and collecting decisions); *cf. Brooks v. Dretke*, 444 F.3d 328, 329–30 & n.11 (5th Cir. 2006) (surveying Supreme Court and circuit law on jurors' "implied bias").

In addition, Juror #13 complained directly to the district court about his health problems and was unable to deliberate on the first day due to these complications. He indicated that "he suffered from various medical problems," that he was "disabled," and that "he suffered from headaches" during which "he would generally like to go to sleep and take a nap." He also stated that he suffered from "short-term memory," which the district court interpreted to mean short-term memory loss. The foreperson confirmed that Juror #13's health-related complaints were a problem during deliberations, as they hindered Juror #13's ability to understand the proceedings. *See, e.g., Huntress*, 956 F.2d at 1312 (observing "it is within the trial judge's sound discretion to remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired") (quoting *United States v. Dominguez*, 615 F.2d 1093, 1095 (5th Cir. 1980) (cleaned up)).

Although the district court did not interview Juror #13 on the record, the court did have a one-on-one interaction with him when he claimed that other jurors were harassing him. Based on that interaction, the court concluded that it "did not believe" Juror #13 was "credible." In virtue of its "unique perspective at the scene," the district court was in a "far superior position" to draw such conclusions. *Ebron*, 683 F.3d at 126 (citation and quotation marks omitted).

At the very least, this record shows that the district court's findings about Juror #13 were plausible. Therefore, the district court did not abuse its discretion in dismissing Juror #13.

## III.

In finding otherwise, the majority opinion errs in three ways. First, the majority advances a minimum investigatory threshold for juror misconduct not found in our law. Second, the majority incorrectly asserts that the district court refused to conduct any investigation. Finally, the majority misapplies the standard of review.

The majority opinion begins by stating that "[w]hile the scope of an investigation into juror misconduct is within the discretion of the district court, the applicable authority requires that there be an investigation." Maj. Op. at 8. Since there plainly was an investigation, *see infra*, the majority can only be suggesting that the failure to clear a certain investigatory threshold—namely, interviewing other jurors and Juror #13 himself—fatally compromises the court's findings. For this proposition, the majority cites four cases: *Patel*, *Virgen-Moreno*, *Fryar*, and *Ebron*. All are distinguishable, and none sets a standard for what kind of investigation a court must perform before making findings related to juror dismissal. To the contrary, our cases have long held, without qualification, that "the scope of an investigation into juror misconduct rests with the court's discretion." *Fryar*, 867 F.2d at 854 (citing *Tillman v. United States*, 406 F.2d 930, 938 (5th Cir. 1969)).

In *Patel*, an unpublished opinion, the district court conducted an extensive investigation before dismissing a juror for failing to follow the court's instructions. 485 F. App'x 702, 712 (5th Cir. 2012). The investigation included interviewing each juror using prearranged questions agreed upon by both parties. *Id.* at 712–13. But while the district court's method of investigation may have been admirable—and, in our words affirming the dismissal, "wise"—

we did not suggest that such an investigation is required in every case. *Id.* at 713. To the contrary, *Patel* affirmed that district courts "enjoy wide discretion to determine the proper scope of an investigation into whether just cause to dismiss exists." *Id.* at 712 (quoting *Edwards*, 303 F.3d at 631). Moreover, the appellant in *Patel* did not argue that there should have been a more thorough investigation; he argued that the investigation went too far and that questioning every juror was unjustified. *Id.* We held only that the investigation did not exceed the *ceiling* for such matters, not that it represented the *floor*. As a result, it is hard to see how *Patel* helps the majority.

*Virgen-Moreno* is similarly unhelpful. In that case, the district court conducted no investigation other than reading a note from a juror who asked to be excused because she was having trouble concentrating. 265 F.3d 276, 287 (5th Cir. 2001). The district court made no attempt to verify the note by speaking with the juror, nor did the court consult with any other jurors, under oath or otherwise. *Id.* We affirmed the dismissal, recognizing that the reasons offered in the juror's note "were sufficient factual support for the district court's decision." *Id.* at 288. Thus, *Virgen-Moreno* also fails to support the majority opinion and particularly its notion that the district court here was obligated to corroborate the sworn testimony of a jury foreperson.

*Fryar*, too, is inapplicable. The precise issue there was not whether a juror had been wrongfully dismissed but whether the circumstances of the dismissal prejudiced the remaining jurors against the defendant (who, ironically, was on trial for jury tampering). 867 F.2d at 853–54. Despite evenly split testimony from the other jurors, the district court concluded that a particular juror's story about being approached during sequestration was false. *Id.* at 852. The district court dismissed the juror for lying, but—after checking with the other jurors to confirm they could still be impartial—allowed the trial to proceed. *Id.* The defendant later moved for a new trial, arguing that the

dismissed juror's story was true and presenting corroborating evidence. *Id.* at 853. The district court denied the motion, and we affirmed. *Id.* at 855. We recognized that "the scope of an investigation into jury misconduct is within the district court's discretion," *id.* at 854, but said nothing about the investigatory threshold in cases where a juror refuses to participate in deliberations.

While closer factually to this case, *Ebron* actually undermines the majority's position. In that case, which involved a deadlocked jury in a murder trial, the district court interviewed all the jurors after the foreperson alleged that one juror had made comments displaying a bias in favor of defense counsel.[1] 683 F.3d at 123. But like *Patel*, the issue in *Ebron* was whether the district court went *too far* in interviewing all the jurors. *Id.* at 125. We held only that "[s]uch an investigation *may* be conducted via careful juror questioning *or any other appropriate means*" but never suggested that questioning every juror was obligatory. *Id.* (emphases added). To the contrary, we cautioned that a court's investigation of juror misconduct must balance "[p]reserving the secrecy of jury deliberations" on the one hand against ensuring "juror compliance with instructions" on the other. *Id.* at 125. Accordingly, we warned that district courts "'should be more cautious in investigating juror misconduct during deliberations than during trial, and should be exceedingly careful to avoid any disclosure of the content of deliberations.'" *Id.* (quoting *Boone*, 458 F.3d at 329). *Ebron*'s nuanced advice to district courts is incompatible with the majority's view that the court was obligated to conduct a more searching investigation of Juror #13.

---

[1] The *Ebron* opinion does not indicate whether any of these interviews, including that of the foreperson, took place under oath.

In a footnote, the majority mentions our recent decision in *United States v. Hodge*, a civil case involving a similar standard for juror dismissal. 933 F.3d 468, 480 (5th Cir. 2019). Maj. Op. at 8 n.3. In *Hodge*, the foreperson testified about an obstinate and threatening juror without revealing the juror's identity. An earlier jury note had described one holdout juror who donned earplugs and refused to deliberate. *Id.* at 479. The district court responded by interviewing all the jurors one-by-one under oath. *Id.* at 480. When the court finally reached Juror #7, that juror denied threatening anyone but admitted wearing earplugs. *Id.* The court dismissed Juror #7, noting it "did not believe he was telling the truth." *Id.* at 481. The court found "credible evidence the juror had not participated in the deliberations and that 'he threatened at least one fellow juror,'" and we affirmed. *Id.* at 480–81 (citing *Ebron*, 683 F.3d at 125–28). But critically, like the previous cases, we never suggested that interviewing all jurors is mandatory. Also, the juror interviews in *Hodge* did little to corroborate the foreperson's testimony and primarily served to identify the offending juror. Here, unlike in *Hodge*, there was never any doubt as to which juror was refusing to deliberate. The district court, the lawyers, and the foreperson all identified him as Juror #13—there was no need to ferret out his identity.

At most, the cases cited by the majority for its investigatory threshold requirement show that a more intrusive investigation, such as interviewing jurors one-by-one under oath, may sometimes be warranted—taking account of the need to protect the secrecy of jury deliberations. No one disputes that point. But what the cases fail to show is that a district court *must* interview jurors one-by-one under oath before dismissing a juror for good cause.

Second, the majority errs by concluding that the district court "refuse[d] to conduct any investigation" and made its decision with "no factual support." Maj. Op. at 11, 12. As discussed above in Part II, the district court did investigate the matter and did have factual support for its findings. The court

swore in the jury foreperson to testify on the record and allowed the lawyers on both sides to question the foreperson as they saw fit. The court also solicited information from Perez, Ramos's counsel, in order to corroborate the bias suggested by Juror #13's note. While the court declined to conduct the sort of investigation requested by Ramos—*i.e.*, a separate evidentiary hearing—it cannot be said that the court refused to conduct any investigation whatsoever. And the majority's assertion that there was "no evidence that Juror 13 had a pro-defense bias or that he refused to consider the evidence and deliberate" is mistaken. Maj. Op. at 11. The foreperson testified to these facts under oath, and Ramos's counsel corroborated that Juror #13 previously knew him.

Third, while the majority opinion correctly articulates our well-established standard of review for juror dismissal, it misapplies that standard. The only question before us is whether the court's findings are clearly erroneous—and "'[a] factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole.'" *Ebron*, 683 F.3d at 126–27 (quoting *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001)). The majority does not explain what makes the court's findings about Juror #13 *implausible* in light of the entire record. The majority instead faults the district court for not performing a more thorough investigation. But that alone does not establish that the court's findings, based on the investigation it did undertake, were "implausible"—especially in light of the deference we must give to trial judges in determining the credibility of witnesses in their own courtrooms. *Ebron*, 683 F.3d at 126.

If we were in the district judge's shoes, perhaps we would have done things differently. That is not our role here, however. The sole question before us is whether the district court's findings were plausible in light of the record as a whole. In light of the foreperson's sworn testimony, the district court's face-to-face interaction with Juror #13, and the facts revealed by defense

counsel and at *voir dire*, I cannot find that the district court's factual findings were implausible. Therefore, I respectfully dissent.